IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73634-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JENNIFER LYNN MOTHERSHEAD, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 28, 2016 |

SCHINDLER, J. — Following a month-long trial, the jury convicted Jennifer Lynn

Mothershead of assault in the first degree of her 13-month-old daughter K.M. By

special verdict, the jury found the mother used her position of trust to facilitate the crime,

knew the child was particularly vulnerable, her conduct manifested deliberate cruelty,

and the assault resulted in substantial bodily harm. Mothershead seeks reversal of the

conviction on the grounds that (1) the court erred in denying her motion to suppress

evidence, (2) the court violated her right to a public trial, (3) the court's evidentiary

rulings violated her right to present a defense, (4) the court erred in refusing to instruct

on the lesser degree offense of assault of a child in the third degree and giving an

abiding belief reasonable doubt instruction, and (5) prosecutorial misconduct and

cumulative error denied her the right to a fair trial. In the alternative, Mothershead

claims the court erred in imposing an exceptional sentence of 480 months and prohibiting her from having contact with minor children. We affirm.

FACTS

Cody and Jennifer Mothershead married in October 2007 and lived in Buckley. Cody worked as a math teacher at White River High School and was the adviser for the high school equestrian drill team. Cody, Jennifer, and her good friend Courtney Valvoda were members of an equestrian drill team.

Cody and Jennifer met Courtney's boyfriend Matthew Bowie in 2008.[1] In July 2009, Courtney gave birth to their son W.B. On February 20, 2010, Jennifer gave birth to a daughter K.M. According to Jennifer and unbeknownst to Cody and Courtney, she and Matthew started having an affair in the summer of 2010.

In the fall of 2010, Jennifer coached the White River High School equestrian drill team. Beginning in September or October 2010, Jennifer started staying at Matthew and Courtney's house in Black Diamond a few nights a week. By January 2011, Jennifer and Cody were separated and she was staying with Matthew and Courtney in Black Diamond the majority of the time. Jennifer took care of K.M. fulltime and did not work. Jennifer told Cody she was the primary caretaker of K.M. Cody was "very seldom" able to spend time with K.M. in Black Diamond.

Courtney and Matthew married in February 2011. Courtney worked full time as a special education teacher at Enumclaw Middle School. Courtney would take her son W.B. to daycare in the morning and return home around 6:00 p.m. Matthew worked in construction. Between January and May 2011, Matthew worked only sporadically.

---

[1] We refer to Jennifer Mothershead, Cody Mothershead, Courtney Valvoda, and Matthew Bowie by their first names for purposes of clarity and mean no disrespect by doing so.

2

Courtney and Matthew had a barn near their house. Jennifer kept her horses in the barn and often took K.M. riding with her.

On March 23, 2011, Matthew watched K.M. in the barn while Jennifer went horse riding. When Jennifer returned, she noticed K.M.'s left eye was "a little swollen" and "red around the edges." Jennifer took K.M. to family physician Dr. James Merril at Enumclaw Medical Center.

Dr. Merril believed K.M. had scratched her cornea but could find no "foreign body" in her eye. Dr. Merril referred K.M. to Mary Bridge Children's Hospital in Tacoma "to see if they could find any of the evidence of a foreign body that continued to cause scratches." Jennifer called Courtney and asked her to go to the hospital with her. The doctor did not find anything in K.M.'s eye and prescribed Erythromycin ointment.

Dr. Merril saw K.M. again on March 25. Dr. Merril was "very puzzled and very worried" by K.M.'s continued eye irritation and referred her to Seattle Children's Hospital (Children's). An emergency room doctor examined K.M. at Children's. Children's pediatric ophthalmologist Dr. Erin Herlihy reviewed the exam notes and prescribed continued use of the Erythromycin ointment.

Dr. Merril saw K.M. again on March 29. Both of her eyes were red and "the skin of the eyelids kind of peeled off a little and started bleeding." Dr. Merril referred K.M. to Children's. Dr. Moore examined K.M. in the emergency room at Children's. K.M. had a corneal abrasion, swelling, and pain in her left eye but there was no foreign object in her eye. Dr. Moore prescribed oral antibiotics and Erythromycin ointment. Dr. Moore and Dr. Herlihy "were perplexed" by K.M.'s eye condition and asked Children's Chief of Ophthalmology Dr. Avery Weiss to assist with the diagnosis.

According to Jennifer, after March 29, K.M. was "progressively getting better," her "eye was opening . . . probably three quarters of the way open," the swelling was down, and the "scabs were almost healed up." In April, Jennifer received a letter from Child Protective Services (CPS) concerning a report that she was not getting medical treatment and care for K.M.'s eyes.

When Dr. Weiss examined K.M. on April 11, 2011, her eye condition "didn't quite all add up" and "no one explanation that was given" was "accounting for all this."

A.      I wasn't sure. It didn't quite all add up. I wasn't — you know, [K.M.] was billed as maybe infection, maybe retained foreign body, injury. But there were — but there was no one explanation that was given that was accounting for all this. She had corneal problems, eyelid problems, conjunctival involvement.

Q.      What does that mean?

A.      These are the various portions of the eyes, so the eyelid skin was involved, and then the covering inside the eyelid and covering the eye, and then the cornea, the clear portion of the eyes in the central portion of the eye through which you see, there was involvement of all three structures.

Dr. Weiss said the eye condition "had been going on for too long" and he was concerned that it kept recurring because "if you have a trauma, usually mild, a corneal abrasion will resolve. It will heal in one or two days."

[K.M.] had a corneal abrasion, which could usually — usually in the child it's trauma. But then she had periorbital cellulitis, which means the eyelid was red and puffy. It didn't — they don't usually travel together. Then she had this — so they were — then she had a concern about her red eyes, so they were treating her for periorbital cellulitis, or conjunctivitis or pink eye. It just didn't make total sense to me. And it had been going on for too long. . . . [I]f you have a trauma, usually mild, a corneal abrasion will resolve. It will heal in one or two days. . . . And an infection, if you have a typical pink eye, a child, which is viral or bacterial, will clear within five, seven days. So this was protracted. It was lasting longer. That's atypical.

Dr. Weiss asked Jennifer about "the barn and what [K.M.] might get into in the barn." As part of the examination, Dr. Weiss decided to scrape the epithelium and do a

"Giemsa stain." Dr. Weiss told Jennifer he wanted to review the "multiple cultures" that had been done and "see what the Giemsa stain showed." Dr. Weiss scheduled another appointment for April 15.

Dr. Weiss concluded the cultures "did not account for the problem." The results of the Giemsa stain were "odd" and showed the "problem, whatever it was, was surface, not deep in the tissue" of the eye.

A.  Well it was odd. I'll never forget that conjunctiva. It showed that the conjunctiva was relatively normal, as best I could tell on the Giemsa stain. But there were lots of neutrophils or inflammatory cells on the surface, and that was odd.

Q.  Why is that odd?

A.  Well it wasn't intrinsic. It meant something was on the surface. This problem, whatever it was, was surface, not deep in the tissue. It was something on the surface. And I — it looked — I mean, 99 out of 100 times I'd say she has an infection. That's what it looks like.

Q.  That's what her —

A.  That's — no. No. I don't go by that. I never go by that alone. I like data. So I did the scraping. And then I — it looked like a bacterial — it looked like an infection.

On April 15, Dr. Weiss admitted K.M. to Children's to perform a biopsy of her eye to rule out rare diseases and take cultures to look "for things that might be in a barn, like a fungus or atypical microbacteria or any other odd pathogen." The biopsy did not reveal anything, "[e]verything was normal." A pediatric dermatologist examined K.M. to rule out Stevens-Johnson syndrome. K.M.'s symptoms were "not consistent with Stevens-Johnson syndrome."

Dr. Weiss also asked Children's Interim Chief for Pediatric Infectious Diseases Dr. Danielle Zerr to examine K.M. Dr. Zerr said K.M.'s eye irritation "appeared quite severe to me in that there was quite a bit of inflammatoria and in addition, her sensitivity to light was particularly extreme." K.M.'s eyes were red and swollen and she had

5

difficulty opening them because of sensitivity to light, but Dr. Zerr found "no other major abnormalities on her physical exam."

Because K.M. was starting "to develop blood vessel growth in the cornea," on April 19, Dr. Weiss prescribed generic corticosteroid eye drops in addition to Polysporin ointment.

Dr. Weiss saw K.M. again on April 26. Because both eyes were affected and K.M. had "lots of white cells," Dr. Weiss prescribed "big-gun antibiotics" Tobramycin and Cefazolin. Children's pharmacy compounded the Tobramycin and Cefazolin eye drop prescriptions specifically for K.M.

On May 2, Jennifer returned to Children's to obtain a refill of the eye drop prescriptions. Dr. Herlihy examined K.M. K.M. was "quite distressed" and "would not open her eyes." There was "redness and swelling and some scratches or broken-down skin on the eye lids" and "a small amount of discharge from the eyes." In addition to the Tobramycin and Cefazolin eye drops, Dr. Herlihy prescribed an oral antibiotic, Augmentin.

Jennifer and Courtney planned to leave to go to the Washington High School Equestrian Teams (WAHSET) State competition in Moses Lake the afternoon of May 12. The morning of May 11, Jennifer took K.M. shopping for food and clothes. That evening, Matthew took care of K.M. and W.B. for a couple hours. Matthew noticed a "soft spot" on top of K.M.'s head and showed the soft spot to Courtney. When Jennifer returned, Courtney showed her the soft spot. Jennifer told Courtney she thought K.M. "seemed to be just fine." Courtney told Jennifer she needed to take K.M. to the doctor

before they left for the WAHSET competition.

> I just told [Jennifer] it was there and it wasn't normal and she needed the [sic] take [K.M.] to the doctor. . . . I just said that she needed to be seen, and I was taking [W.B.] to get his sinuses checked out anyway, so they had time — or she had time to go to the doctor.

Early the next morning, Jennifer took K.M. with her to get the horses for the WAHSET competition and go to the horseshoer. According to Jennifer, she and K.M. held "the horse together" for the horseshoer. Before calling Dr. Merril's office to schedule an appointment, Jennifer "had some breakfast" and "[p]acked some more stuff . . . [f]or the WAHSET state meet."

Dr. Merril was not available. The nurse insisted Jennifer take K.M. to Enumclaw Medical Center. When Jennifer arrived at Enumclaw Medical Center, Dr. Van Fossen examined K.M. and ordered a CAT[2] scan. The CAT scan "showed a very large bleed along the entire right portion of [K.M.'s] brain" that was "pushing the brain off to the other side." Medical personal airlifted K.M. to Harborview Medical Center.

Jennifer called Courtney and Cody to tell them K.M. had been airlifted to Harborview. Cody was at an out-of-town school event and could not immediately leave. Courtney offered to go with Jennifer to Harborview. Before leaving to go to Harborview, Jennifer packed the eye medications and other items in the diaper bag.

Harborview emergency room social worker Susan Fouts called Jennifer to make sure "she was on her way." Dr. Breanna Kinghorn examined K.M. when she arrived at Harborview. Dr. Kinghorn was "worried about [K.M.'s] neurological status." Dr. Kinghorn also noted the condition of K.M.'s eyes and bruising on her body. K.M. had

---

[2] Computerized axial tomography.

"swelling of her upper and lower lids," "discharge and crusting of her eyes bilaterally," "bruises along her spine," and "two bruises on her arm."

Dr. Kinghorn ordered another CAT scan and reviewed the medical records from Children's.

> What I had found is that the month before, about two months before, [K.M.] had been diagnosed with a corneal abrasion, which is basically a scratch on the cornea, that they thought she had sustained maybe kind of outside somewhere. And then had seen Dr. Weiss, one of our ophthalmologists, several times for kind of repeat antibiotic courses with no subsequent improvement. She had then had a hospitalization at Children's where it seems to me she had been seen by ophthalmology, infectious disease, and dermatology, so it was — it still remained a bit of a mystery looking at the notes. No one had a clear explanation on what was going on.

The CAT scan showed increased bleeding. Dr. Kinghorn admitted K.M. to the Pediatric Intensive Care Unit (ICU) for close observation in coordination with the neurosurgical team and started K.M. on a broad-spectrum antibiotic for "any potential infection." Harborview contacted the Pierce County Sheriff's Department to report a "suspicious" head trauma and "an unexplained head injury."

Dr. Kinghorn and social worker Fouts met with Jennifer and Courtney as soon as they arrived. Dr. Kinghorn told Jennifer and Courtney that K.M. had a traumatic brain injury and discussed the treatment plan. Dr. Kinghorn said unlike Courtney, Jennifer was "not tearful" and "didn't seem distraught." Dr. Kinghorn said Jennifer's reaction was disconcerting—Jennifer kept interrupting and saying that "she had missed the drill team" and "had missed that show that day, that she was not there for her students."

> Meaning that just in direct comparison, her friend at the time had been tearful. Whenever you mentioned traumatic brain injury you expect some kind of response. Everybody copes in different ways. We realize that. But it was distracting to try to work through the medical diagnosis and the plan without the interruptions regarding horses and equestrian sports.

8

. . . .

> Like I said, not with — in comparison to her friend that was there, [Jennifer] — she did not — she was not tearful, she didn't seem distraught about it. I usually try to have — just because with that particular brain — or traumatic brain injury, we're not quite sure where kids are going to go. We felt like she was stabilized for the time being, but the fact that neurosurgery was involved, sometimes children have to have skull surgery, bolt placement, it can get pretty — the acuity can increase pretty quickly. That's one thing I wanted to prepare her for. The pediatric ICU at Harborview, the acuity is the highest. So it was difficult to convey that to Mom and have the response that I would have expected.

Dr. Kinghorn asked Jennifer and Courtney to meet with Fouts "to get a little bit more history as far as what happened, what led to the outside emergency room visit, and just get more past medical history." Fouts met with Jennifer and Courtney for approximately an hour. Fouts asked Jennifer about the prior CPS involvement and what happened, "why her child was here with a head injury."

Cody arrived as soon as he could between 9:30 and 10:30 p.m. The doctors told Cody they "were monitoring" K.M. and "they had standby for the bleed on brain, if they were going to have to take her into surgery or not."

Harborview Child abuse consultant and physician Dr. Naomi Sugar contacted Dr. Weiss that night to tell him K.M. had been admitted for a subdural hematoma. Dr. Weiss told Dr. Sugar that while it "was the last thing on my mind," Dr. Sugar should "investigate the mother for putting something on the eye" because that would "account for everything."

The doctors asked to see the eye medications Jennifer had been giving K.M. Cody and Courtney went to Courtney's car and retrieved the eye medications Jennifer brought with her in the diaper bag. Cody and Courtney placed the small cooler with the medications in the hospital room "next to [K.M.]'s bed."

9

Pierce County Detective Sergeant Teresa Berg and Detective Lynelle Anderson arrived at Harborview at approximately 11:30 p.m. The detectives spoke briefly with medical staff before meeting with Jennifer, Cody, and Courtney. Detective Anderson said that throughout the conversation, Jennifer was cordial and "[v]ery calm." Jennifer told the detectives she was the primary caretaker of the child and K.M. did not attend daycare. Jennifer told the detectives K.M. was sleeping 20 to 22 hours a day. Jennifer "said that she had been running her hands through [K.M.'s] hair and noticed the squishy spot."

Jennifer also described K.M.'s eye condition.

> And what we were told was that there had been — it was March of 2011 and [K.M. had] been in the barn, possibly got a piece of hay or some other type of debris and she got a corneal abrasion. From that [Jennifer] noticed that the eye had gotten puffy, took her to the doctor for treatment and shortly afterwards believed there was some cross contamination and it spread and became cellulitis in both eyes.

Jennifer told the detective she was "primarily responsible" for administering the eye medications to K.M. Jennifer said Cody did not give K.M. eye medications, but Matthew and Courtney sometimes helped.

After meeting with Jennifer, Courtney, and Cody for approximately 40 minutes, Detective Anderson and Detective Sergeant Berg went to see K.M. Detective Anderson was shocked by "her appearance."

> Oh, [K.M.] was shocking. I was not prepared for that. The description of having an eye infection didn't adequately cover what her eyes looked like. They were swollen shut, and the whole top part of her face was almost . . . not — I wouldn't say unrecognizable, but it looked extremely painful. She looked like she was in pain. . . . She had some bruises on her. . . . On the back of her head, she had some on her arms, and I believe she had a few on her trunk.

Detective Anderson and Detective Sergeant Berg told Jennifer and Cody they were placing K.M. in protective custody. Jennifer insisted on returning to K.M.'s room to give her the eye medications. Jennifer "wanted to be the one to give the eye drops. She was focused on the eye drops. She didn't say 'go back in the room, say good-bye.' She didn't ask anything like that."

Harborview ICU pediatrician Dr. Michael Davis examined K.M. on May 13. His primary concern was "her neurological status. . . . [K.M.] spent the majority of the first couple of days very sleepy, which is very unusual behavior for a toddler." Dr. Davis also noted severe eye irritation and a "variety of bruises" on K.M.

> She had an eye irritation, blepharitis, conjunctivitis, which is, again, irritation to her eye. She had that preceding her hospitalization, but it was pretty severe. That was another thing in our examination. A variety of bruises, small bruises, mostly on her back, some of [sic] her arm, a little unusual in position.

Because the medical team was concerned that K.M. was suffering from "chemical keratitis" and an "acidic or basic solution specifically being introduced into the eye," Dr. Sugar asked Harborview pediatrician Dr. Justin Heistand on May 13 to test the pH[3] of the prescription eye medications that were in K.M.'s hospital room. Dr. Heistand located the eye drop medications in a soft-sided zipped cooler in K.M.'s room. When Dr. Heistand opened the bottle of Tobramycin and put a drop "onto the [pH] paper, noxious smells filled the room" that "caused eye burning and nausea." Dr. Sugar contacted Detective Sergeant Berg. On May 13, a Pierce County detective retrieved the eye medications from Harborview.

Detective Anderson scheduled interviews with Jennifer, Cody, Courtney, and Matthew for May 16. During the May 16 interview, Jennifer told Detective Anderson that

---

[3] Potential of hydrogen.

"actually it was Matthew who initially had located the soft spot on [K.M.]'s head."

Jennifer explained that she said something different during the interview at Harborview because she was involved in a romantic relationship with Matthew and Courtney and Cody did not know about the affair. Jennifer said she was pregnant with Matthew's child and Courtney "was unaware" of the pregnancy.

A.  [Jennifer] told us that actually it was Matthew who initially had located the soft spot on [K.M.]'s head.
Q.  Did she acknowledge that she had said something different at the hospital a few days prior?
A.  Yes, she did.
Q.  Did she, during this conversation on May 16th, also talk to you more about her relationship with Matt Bowie and Courtney Valvoda?
A.  Yes, she did.
Q.  What did she tell you about her relationship with them?
A.  She was involved in — she was involved in a relationship with Matthew Bowie, and in fact was pregnant with his child at the time. Courtney was unaware of that pregnancy.

On May 18, Detective Anderson and Detective Sergeant Berg examined the prescription eye drop medications. Detective Anderson noted the Tobramycin eye drop prescription dated May 2, 2011 was full but the Cefazolin prescription was not full. When Detective Anderson opened the Tobramycin, she smelled a "noxious," "overwhelming" odor that "made [her] eyes burn." The exposed skin between her glove and shirtsleeve became irritated from "whatever emanated out of" the Tobramycin bottle.

Detective Sergeant Berg obtained a reference sample of Tobramycin and Cefazolin from Children's pharmacy. On May 20, Detective Sergeant Berg took the reference samples from Children's pharmacy and the prescription eye drops found in

12

K.M.'s hospital room to the Washington State Patrol Crime Laboratory (WSPCL) for testing.

WSPCL forensic scientist Jane Boysen compared the Tobramycin and Cefazolin prescriptions dated May 2 with the control samples. Boysen noted the volume of the May 2 Cefazolin prescription was approximately 11 milliliters while the volume of the May 2 Tobramycin prescription was approximately 14 milliliters. Boysen found "no real differences" between the May 2 Cefazolin prescription and the control sample.

The odor of the May 2 prescription for Tobramycin was stronger and the color was different. The control sample "was a clear colorless liquid" and the May 2 prescription for Tobramycin was a "dark amber color, very dark." Boysen detected chlorophenol in the May 2 prescription for Tobramycin and concluded that it likely "contained chlorine." At the request of the police, the United States Food and Drug Administration (FDA) tested the May 2, 2011 eye drop medications.

On April 30, 2012, the State charged Jennifer with intentional assault of K.M. in the first degree in violation of RCW 9A.36.120(1)(b)(i), (ii)(A), and (ii)(B) and RCW 10.99.020(5). The State also alleged Jennifer's conduct manifested deliberate cruelty to K.M., K.M. was particularly vulnerable or incapable of resistance, and Jennifer used her position of trust or fiduciary responsibility to facilitate the commission of the crime as aggravating factors.

The month-long jury trial began in September 2013. A number of witnesses testified on behalf of the State including Dr. Merril, Dr. Weiss, several Harborview doctors, WSPCL forensic scientist Boysen, FDA chemists, Detective Anderson, Detective Sergeant Berg, Matthew, Courtney, and Cody. The court admitted into

13

evidence more than 80 exhibits including photographs showing the condition of K.M.'s eyes and a recent video of K.M.

Dr. Merril testified a corneal abrasion or scratch is not an uncommon injury in children, caused by "maybe a finger that gets in the eye or the own patient's fingernail. Or sometimes you get . . . something under the eyelid that moves around in there and scratches the cornea." Dr. Merril said the corneal abrasion in K.M.'s left eye did not "seem particularly deep" and he expected the abrasions would heal within 24 hours.

Dr. Weiss testified that he conducted an "exhaustive diagnostic evaluation" to try to determine the cause of K.M.'s eye injuries. Dr. Weiss concluded the only explanation for the cause was "some noxious agent being instilled on the eye."

> A.    . . . I felt that they would have to investigate the mother for putting something on the eye, because the findings were most consistent with some noxious agent being instilled on the eye. I thought it was something [K.M.] had just fell into in the barn, but, you know, the other possibility was someone else was putting it on her eye.
> Q.    When you say, "the findings were most consistent with that," what are you referring to?
> A.    The whole clinical picture. The eyelid skin, the cornea, and the conjunctiva. The fact it was on the lower part. It's hard to get the lid and the conjunctiva and the cornea, particularly starting out in the inferior portion of the cornea, in a person and then whom you do — looks like that would explain and account for all three structures being exposed to whatever agent there is. And then the Giemsa stain. The Giemsa stain kept showing this recruitment of white cells for which there was no explanation. I said there's something on the surface and we just haven't found it. That's why we kept investigating the barn. But then somebody putting something on the eye, that was the last thing on my mind. Would account for everything. So I said, "I think it accounts for everything, . . . and I think this is unusual, but I think this does represent child abuse."

Dr. Weiss testified that when K.M. was admitted to Harborview, there was a "dramatic change in her corneal status" from when he had previously seen her.

> [T]here's a seven-by-nine millimeter defect in the corneal epithelium on the left eye, and now there's central thinning of the underlying stroma. So instead of being like that, it was like this. And there's — now there's blood vessels growing into the cornea 360 degrees. These are new findings. . . . [N]one of this is good. It means that this is all a severe toxic reaction to whatever was instilled onto the eye. And the eye is responding the best way it can to solve the problem, but this is not going to recover to normal.

Dr. Weiss testified the doctors at Harborview noted a "complete loss of the epithelium. . . . The covering . . . of the cornea. . . . [T]he several levels of epithelium that cover the cornea . . . were gone." Dr. Weiss testified that loss of the epithelium is "the most severe corneal abrasion [K.M.] could have" and caused "a lot of pain."

Dr. Weiss testified about his examination of K.M. on May 20 and the dramatic change.

> Her eyelid skin was red and irritated. There was loss of some of the epithelium from the eyelid skin. And then the conjunctiva. The cornea looked much worse. In the left eye there was central thinning of the cornea, for about an extent of the angular area, circular area, four millimeters. This was — this little — this central area of thinning was then surrounded by diffuse corneal epithelium . . . and blood vessels. Blood vessels were growing into the cornea 360 degrees.

Dr. Weiss testified that after examining K.M., he concluded a noxious agent had been instilled into her eyes.

> . . . I concluded that everything was just consistent with a toxic epitheliopathy, that is, somehow a very noxious agent was being instilled onto her eye or — and that was causing all these problems. . . . There's nothing else that can cause this problem now. Other than noxious agents being instilled in the eye. Because we ruled out every other possibility.
>
> . . . .
>
> Q. So what was your official diagnosis, I guess, after the May 20th exam?

15

A.    Well, we sort of had two smoking guns.  So we do have evidence of — of a toxic conjunctivitis, keratitis, that somebody's instilling or somehow she's getting a noxious agent instilled into both eyes.

Dr. Weiss testified that K.M.'s vision in her left eye is "20/260, so she can see the big E. . . . And that's it.  And that's not going to get better.  It's only going to get worse."  Dr. Weiss testified that "without question," K.M. suffered "irreversible" and "permanent damage to her eyes" from a noxious agent being repeatedly instilled in her eyes.

Harborview ICU pediatrician Dr. Davis described K.M.'s head injury as "a life threatening problem."  "Her bleed was actually quite large, and it reached the point where it was actually pushing the brain off to the other side, indicating there was a fair amount of pressure on the brain."  Dr. Davis testified the ophthalmologists found no foreign bodies in K.M.'s eyes and the cultures from her eyes were negative for infection.  Dr. Davis testified that in his opinion, K.M.'s eye injuries looked more like a "chemical type of irritation" than an infection.

Children's ophthalmologist Dr. Herlihy also testified that K.M.'s "condition and symptoms" were consistent with "bleach having been put into her eyes" because there was "severe damage to the surface of the eyes," and "[e]verything else basically had been ruled out."

FDA Office of Criminal Investigation Senior Special Agent Jim Burkhardt testified that the FDA laboratory "is probably the best lab in the country" to identify potential foreign substances.  FDA forensic chemist David Jackson is an expert in bleach contamination.  Jackson testified that the May 2, 2011 Tobramycin prescription contained chlorate but the reference sample did not.  Jackson testified the Tobramycin

prescription was "spiked with bleach." FDA chemists Lisa Kaine, Heather McCauley, and Adam Lanzarotta also testified that the Tobramycin recovered from K.M.'s hospital room was consistent with Tobramycin spiked with bleach.

Matthew testified he and Courtney were married and had two children, W.B. and an infant daughter M.B. Matthew said he met Jennifer and Cody through Courtney.

Matthew testified he and Courtney lived in Black Diamond in 2011, and in the spring of 2011, Jennifer and K.M. stayed with them the majority of the time. Matthew said he and Courtney let Jennifer stay with them because "we knew things — things weren't good for her and just trying to be nice, I guess, and her horses were there, and then [K.M.] started having problems," and he and Courtney felt bad for K.M. Matthew stated that he and Courtney allowed Jennifer to stay at their home, in part, because of the problems with K.M.'s eyes.

Matthew testified that in March 2011, K.M. was "out in front of the barn" and "got something in her eye." Matthew said he "didn't see it happen or anything" but K.M. was upset and crying.

Matthew testified Jennifer kept the eye medications in the kitchen refrigerator or in the diaper bag. Matthew said K.M. did not like the eye medications and he would help hold K.M. while Jennifer administered the eye drops. Matthew said the drops "didn't smell good." Matthew testified he "never knew there was anything wrong with the medication at any time."

Matthew testified the State granted him immunity from prosecution in exchange for testifying truthfully. Matthew said he was concerned about liability because he

helped administer the eye drops.

> . . . . I would say generally I was just in shock of the whole thing. And when I learned of the alleged contaminated eye drops, it — I can't explain in words the sickening horrible feeling that you have because you were involved in that.
>
> . . . .
>
> Q.  Okay. What do you mean, you were involved in that?
> A.  That you were there and helped administer the eye drops, that — that is one of the most horrible feelings I've ever felt in this whole thing.

Matthew testified that while taking care of W.B. and K.M. the evening of May 11, he noticed the soft spot on K.M.'s head and showed it to Courtney.

> I asked my wife, "Courtney, come here," and I asked her — I thought it was the soft spot from when they're born and the question to my wife was, "How long does it take for this thing to heal?" and she looked at me like, they don't have it now, like I was an idiot. She showed a face of concern and she showed Jenny.

Matthew testified that he and Jennifer were involved in a romantic relationship that continued throughout the time Jennifer and K.M. lived with them in Black Diamond. Matthew said he "knew it wasn't right" and the affair "just was eating me up." Matthew testified that he told Jennifer he wanted to end the affair. Matthew testified:

> I — the horrible things involving like the — this case, that's — I don't — I don't want anything to — I don't want to remember none of it. I do want to remember the — how the horrible feelings I felt with regards to the affair, and how close I came to losing everything that I have. And I kind of — that hurt is with me every single day, and it makes me — . . . I — I always have that hurt inside me, and it is a reminder of what — what results from making horrible choices.

Matthew testified that Courtney told him Jennifer was pregnant with his child. "I got a phone call from my wife. She was crying, telling me that she had talked to someone, saying that Jenny" was pregnant. Matthew said he then called Jennifer and

she told him she was pregnant with his child. Matthew testified that he was "shock[ed]" and did not want to have a child with Jennifer.

Courtney testified that she and Jennifer were good friends. Courtney testified that Jennifer and K.M. stayed with them at their house in Black Diamond off and on in December 2010 and January 2011, and beginning February 2011, "four or five times a week . . . if not more." Courtney said that in 2011, she was working fulltime and going to school, Jennifer was taking care of K.M. and not working, and Matthew was working only intermittently.

Courtney testified that she thought Jennifer should stop staying with them so often but did not ask her to leave because it "[s]eemed like [Jennifer] was having a hard time with the marriage, and then they were having a hard time and [K.M] was sick." Courtney testified that during the time K.M. was suffering from the eye infection, K.M. "slept a lot."

Courtney said the doctors prescribed ointment and later prescribed eye drops to treat K.M.'s eye infection. Courtney testified Jennifer maintained exclusive control of the eye medications and eye drops. Courtney said Jennifer always took the medications with her when she left the house. Courtney said that "from the first time we went to Mary Bridge" in March 2011, K.M. did not like getting the eye medications. Courtney testified Jennifer was always there to administer the medications to K.M. and she and Matthew would help Jennifer. Courtney recalled one of the eye drop medications had a "mediciny smell." Courtney said, "One time Jenny asked if . . . I thought they smelled funny," and she told Jennifer the medications "had a smell, but if she was worried about it she needed to call the doctor at Children's."

19

Courtney testified that she first learned Matthew and Jennifer were involved in a romantic relationship after she met with Detective Anderson and Detective Sergeant Berg on Monday, May 16.

Harborview social worker Fouts testified that during the hour-long interview with Jennifer on May 12, she "was very matter of fact. Was not emotional at all. Almost seemed disinterested." Jennifer told Fouts that "it was like living with a blind child, and that [K.M.] slept 22 hours a day, and [K.M.] couldn't see anything." Fouts said Jennifer's demeanor was "unusual."

> A. Well, usually when a child is airlifted to Harborview with a head injury, the parent is pretty upset. Pretty emotional. You would worry about, does my child have a head injury that is going to be significant for a lifetime? Do they need to go to surgery? It's usually pretty significant. And upset, crying usually.
> Q. Has that been your typical experience?
> A. Yes.

Fouts testified Jennifer told her that "CPS had been involved because somebody had reported that [K.M.] wasn't getting medical care." But Jennifer said K.M. had been getting medical care since March.

Detective Anderson and Detective Sergeant Berg testified about what Jennifer told them during the interview at Harborview on Thursday, May 12. Jennifer denied "knowing of any trauma." Jennifer told the detectives she noticed a "squishy spot" on the top of K.M.'s head the night before. Jennifer described an incident from the previous Tuesday when K.M. fell from the bed onto a table, then onto the floor. Jennifer said K.M. hit her right shoulder and "only fussed a little bit and there was no injury seen or noticed." Jennifer also described a fall the Thursday before when K.M. "stood up to drink from her sippy cup in the living room, and she ended up falling forward and hitting

her mouth on the sippy cup, which loosened one of her little baby teeth." Jennifer "acknowledged that [K.M.] did have a lot of bruising on her extremities and shoulder blades and such," and that she noticed "bruising that morning, and — but she didn't know what they were from." Detective Sergeant Berg testified, "These falls, as they were described, did not cause that — the traumatic brain injury that this child had."

In response to questions about how much K.M. slept, Jennifer told the detectives K.M. is "in a lot of pain" and was sleeping "probably 20 to 22 hours a day by this point." Jennifer told the detectives she was "the person who actually put the drops in [K.M.]'s eyes." Jennifer said there were "two different sets of drops" that each "had to be administered four times a day." Jennifer told the detectives that "they called [K.M.] 'The Fighter' " because K.M. "would fight" while Jennifer administered the eye drops.

Cody testified that in September or October 2010, Jennifer started staying with Courtney and Matthew in Black Diamond a few nights a week, and by January or February 2011, she was staying with them the majority of the time. Cody said that after he and Jennifer separated, he moved to Graham, Washington. Jennifer told Cody that K.M. "could not be away from her for a long period of time because she was the primary caretaker." After K.M. started having problems with her eyes, Cody did not "really get time alone" with K.M. because "Jenny said that she had to administer the eye medication. Because she was the primary caretaker."

Cody said that "[m]ost of the time," Jennifer did not tell him beforehand about the doctor appointments for K.M. Jennifer did not tell Cody about the May 12 doctor appointment for the soft spot on K.M.'s head, "First time I heard about it was when the call that [K.M.] was being airlifted." Cody was coaching a baseball game in Tacoma

when he got the call from Jennifer that K.M. was being airlifted to Harborview. Cody said he drove to Harborview in Seattle on May 12 as soon as he could and was "just overwhelmed, . . . it's all a blur." Cody said that after the detectives took K.M. into protective custody, they "told us we had to leave the hospital."

Cody testified he visited K.M. while she was at Harborview for approximately a week and while her eye condition was "still horrible," it improved. After Harborview, K.M. was discharged to Cody.

Cody testified he has custody of K.M. and continues to take her to Dr. Weiss at Children's. Cody said at first, Dr. Weiss prescribed Tobradex drops four times a day, but K.M. currently needed drops only two times a day. Cody said K.M.'s eyes are "very, very, very light sensitive" and she needs to take ibuprofen or Tylenol every day. "We — when we go to town, she has to have a blanket over her head any time we go out in the sunlight. So we get somewhere and she's drenched in sweat." Cody testified that in the past two and a half years, K.M. has dramatically improved, "She improves drastically. From the time I got her in May [2011] until now, when we're in the house, she plays, she's happy."

Detective Anderson testified that she visited Cody and K.M. a couple months after K.M. was discharged from Harborview and K.M. had improved. When Detective Anderson visited Cody and K.M. again in January 2013, Detective Anderson saw "[s]ignificant improvement" to K.M.'s eyes."

> Significant improvement to her eyes. Still had to — when she came in
> from the parking lot to the library, had to have a blanket over her to block
> the light so that it would avoid the discomfort. But once inside was able to
> — little shy, but was able to interact.

22

Detective Anderson visited Cody and K.M. again in May 2013 to "videotape K.M. to show . . . her recovery and how she currently is." The court admitted the video into evidence and the State played the video for the jury.

At the conclusion of the State's case in chief, the defense moved to dismiss the charge of assault of a child in the first degree. The defense conceded there was "no dispute" that the May 2, 2011 eye drop prescription for Tobramycin was "different and something was wrong with them." But the defense argued the State presented no evidence that Jennifer "knew about that or had reason to know about that," or that Jennifer "had administered any of those suspect eye drops" to K.M.[4]

The court denied the motion to dismiss. The court ruled, in pertinent part:

> I believe at this point, based on the Court's understanding of the arguments, is the intentional element, the actual act of the defendant putting the eye drops into [K.M.] is what's been disputed. And the claim of insufficiency of evidence being brought by the defense, the defense admits the truth of the State's evidence and all reasonable inferences that can be reasonably drawn from the evidence that has been presented. And given that, I have reviewed the evidence in the State's case. And what — the evidence can reasonably be inferred here shows that the bottle that was taken into evidence was the May 2nd, 2011, bottle. The bottle, based on the testimony of the Detectives Anderson and Berg, Detective Sergeant Berg, that bottle was full — the eye drops, the Tobramycin bottle, was full when it was taken into evidence. The testimony was also that the defendant administered the medications, and if we recall Matt Bowie's . . . testimony, his testimony, as well as Courtney Bowie's testimony, is consistent that [K.M.] was given these meds two times a day, at least two times a day. Both Matt Bowie — Matthew Bowie and Courtney Bowie observed [K.M.] being given this eye drop medication by her mother, the defendant, Jennifer Mothershead. And that the defendant, Jennifer Mothershead, gave the medications, the eye drop

---

[4] The defense argued, in pertinent part:

Now, is there evidence that the eye drops prescribed on May 2, 2011, were different and something was wrong with them? Yeah, there is. There's no disputing that. But what the State does not have and has not presented is any evidence whatsoever that A, my client knew about that or had reason to know about that, or B, that my client had administered any of those suspect eye drops to young [K.M.]. And absent any of that evidence — and there is a total lack of evidence — the case falls.

23

medications, to [K.M.] the majority of the time. That every time they observed [K.M.] getting the medication, the defendant was always there, and that if the defendant was not at the residence, the medications would not be there. They would be with the defendant. I believe that testimony is consistent with the testimony of Cody Mothershead just yesterday, that one of the reasons he was not allowed to see his daughter more often, in addition to the fact that his schedule didn't allow him to, was the fact that Jennifer Mothershead, the defendant, told him that she's the primary caretaker and she has to give [K.M.] her medicines.

We also have testimony, therefore, that the medications were in the defendant's possession. We also have the FDA testimony, and that evidence is that the medicines that were tested, including the Tobramycin that was tested, that was retrieved from the hospital and taken into evidence, was consistent with medication containing bleach. We also have the testimony of Dr. Weiss and other medical personnel, that all other possible causes of [K.M.]'s eye condition had been ruled out — viral, bacterial, fungal, and mechanical. And that the symptoms — I believe it was Dr. Weiss that testified to this — the symptoms that [K.M.] presented was consistent with a chemical or noxious agent being administered to the eye.

Jennifer testified on behalf of the defense. Jennifer said Matthew was watching K.M. on March 23, 2011 while she went horse riding for approximately a half hour. Jennifer testified that while she tied up her horse, she heard K.M. "whining" and saw K.M. was in an area of the barn where they washed off the horses. Jennifer said K.M.'s left eye was swollen and red around the edges, and K.M. kept "poking at" her eye.

Jennifer testified that she was the primary caretaker of K.M. and she was responsible for administering the eye medications to K.M. K.M. "cried," "screamed," and "fought" when Jennifer administered the eye drops. Jennifer testified she was the primary person who actually put eye drops in K.M.'s eyes. However, sometimes Jennifer needed help while administering the eye drops, requiring K.M. to be swaddled while someone else held her head. Jennifer said Cody never administered K.M.'s eye medications but Matthew and Courtney would help.

24

Jennifer described how she administered the eye drops to K.M.:

Basically, you wrap her — you lay her arms down next to her and wrap her up tight in the blanket, so just her body's in the blanket and it's tight. And then you lay her down and either you have somebody helping you hold her, which makes it a lot easier. The person holding will typically sit in front where the person administering the drops would kind of sit over her. And you would hold kind of the side of her head and then use your fingers to open her eye and put the drops in.

Jennifer testified she never noticed a noxious smell or experienced any stinging or burning from the eye medications. Jennifer testified she had no personal knowledge about the Tobramycin being a dark color or having an unusual smell.

Jennifer said K.M. was "starting to open her eyes" and seemed better on May 11. Jennifer testified Courtney administered the eye drop medications "all by herself" the evening of May 11 and the next day, K.M.'s eyes were "swollen completely shut" and "the worst it's been." Jennifer testified that after the detectives placed K.M. into protective custody and said they "needed to leave then and there," "I asked if I could go in and say goodnight" to K.M.

Jennifer admitted the "number one" reason she spent "so much time" at Courtney and Matthew's house was because she was involved in a romantic relationship with Matthew. Jennifer said she "wanted to be with" Matthew and thought eventually they would "be together." Jennifer admitted she knew she was pregnant with Matthew's child. Jennifer testified her daughter E.B. was born in August 2011 and Matthew is the father.

The State called Detective Anderson and Detective Sergeant Berg in rebuttal. The detectives testified that on May 12, 2011, Jennifer did not ask or indicate that "she wanted to go in to say goodnight to her daughter." "It stood out for us because

25

[Jennifer] was asking to go give the eye drops. She didn't ask to go say good-bye to [K.M.] or kiss her; she requested to give the eye drops."

The court instructed the jury on the charge of assault of a child in the first degree and the aggravating factors.[5]

In closing, the prosecutor argued the evidence established K.M.'s symptoms were consistent with having a caustic or toxic substance like bleach put in her eyes. The prosecutor argued all the doctors "testified this is not consistent with anything else they've seen."

> Pediatric physicians, the dermatology doctors, infectious disease doctors all testified this is not consistent with anything else they've seen. And of course, when [K.M.] was no longer coming into contact with bleach, she was no longer getting bleach put into her eyes, she began to heal. She began to get better.
> Now, this had been ongoing, like I said earlier, for seven weeks. It's not like she just all of a sudden presented with this problem, these

---

[5] Jury instruction 7 states:

To convict the defendant of the crime of assault of a child in the first degree, each of the following three elements must be proved beyond a reasonable doubt:

(1) That on or about the period between March 23, 2011 and May 12, 2011, the defendant:

    (a) intentionally assaulted K.M. and recklessly inflicted great bodily harm; or

    (b) intentionally assaulted K.M. and caused substantial bodily harm, and the defendant had previously engaged in a pattern or practice either of:

    assaulting K.M. which had resulted in bodily harm that was greater than transient physical pain or minor temporary marks or

    causing K.M. physical pain or agony that was equivalent to that produced by torture;

(2) That the defendant was eighteen years of age or older and K.M. was under the age of thirteen; and

(3) That this act occurred in the State of Washington.

If you find from the evidence that elements (2) and (3), and any of alternative elements (1)(a) or (1)(b), have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (1)(a) or (1)(b) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of elements (1), (2), or (3), then it will be your duty to return a verdict of not guilty.

symptoms in her eyes. Seven weeks ongoing. Someone was doing this for those seven weeks. And that person was her mother, the defendant.

The evidence that you've heard in this trial points to the defendant instilling a toxic substance. We know that the May 2nd, 2011, had bleach present in it at one time. Placing into [K.M.]'s eyes repeatedly. The defendant was the primary caregiver. By her own admission, although she would attempt to backtrack from it somewhat, she was constantly with [K.M.]. She was the primary caregiver for her daughter.

The prosecutor pointed to the testimony of WSPCL forensic scientist Boysen.

Don't forget also that this bottle, the May 2nd bottle of Tobramycin, was full when Detective Anderson looked at it on May 18th, 2011. The Cefazolin was not. Jane Boysen from the State Patrol measured it when she got it for analysis, which means she was the first person to analyze it. Nothing had been removed from it yet for testing or analysis. Her measurements, there were 14 MLs of the Tobramycin, but only 11 MLs of the Cefazolin. And the two control samples, just obtained from the pharmacy, not used by anybody because they weren't prescribed for anybody, 15 MLs each. Each medication, Tobramycin, Cefazolin, required four times a day. They should have been equal. The defendant had been using the May 2nd, 2011, Tobramycin. She had to have been. She finally admitted that she had to have been. The only reason it would be full still is if she added something to it, which she did. She added bleach.

The prosecutor argued Jennifer was not credible.

So it's your job to weigh [Jennifer's] credibility just like anyone else's. You can consider things like her demeanor. Not just her demeanor as people testified it was on May 12th, 2011, in the hospital, but also here on the stand. That when she testified first in the morning, during direct examination by [defense counsel], she was pretty happy. She smiled. There was a little bit of laughter. And then we took the lunch break, and when we came back she was more somber, subdued. And then during my cross exam, defensive, and at times hostile. You're allowed, as jurors, because she testified as a witness, to consider those things. Her credibility is at issue just like anyone else's.

The defense argued Jennifer was not guilty. The defense argued there was no dispute the eye infection started when Matthew was taking care of K.M. The defense argued there was no evidence Jennifer knew there was anything wrong with the eye

27

drop medications, and she continued to seek care for K.M.

> [K.M.] starts out with one eye. At one point it was good enough and healed enough that, Jenny, paying attention to the medication, stopped giving it because it was healing and then all of a sudden it gets worse again. But as soon as it does she's back at the doctor. She's back at the doctor. If you don't want your child to heal you don't keep going to the doctor. And you don't take the child all the way up to Seattle to what you've been told is the best place you can go. Where they're going to find something if something was wrong. So let's move on from that.

The defense argued the evidence showed K.M. was suffering from an infection that the doctors failed to treat.

> [Dr. Weiss] says it's all science. Did he seem at all a little smug and eager to leap to a conclusion after a head injury to which there was no explanation was suffered? Boom. Contrary to everything else that had gone before. There had been tests, lots of tests. There were continuing tests and continuing inquiries. At one point E Coli was found. There was an explanation for the staph, staphylococcus, which is everywhere. E Coli, you don't expect to find that. But that didn't raise any concern. But they kept looking for it. At some point they'd find evidence of a foreign body. But then we couldn't find it. Yeah, it was a very puzzling clinical picture. But don't jump to a conclusion that covers you, when you haven't been able to figure it out. Because we still don't know to this day if it was infectious, bacterial, neurological, virological, if that's a word, whatever it was.

The jury found Jennifer guilty of assault of a child in the first degree in violation of RCW 9A.36.120(1)(b)(i), (ii)(A), and (ii)(B). By special verdict, the jury found Jennifer intentionally assaulted K.M. causing substantial bodily harm and engaged in a pattern or practice of "causing K.M. physical pain or agony" equivalent to torture. The jury found Jennifer used her position of trust to facilitate commission of the crime, she knew K.M. was particularly vulnerable, and her conduct manifested deliberate cruelty to K.M. The court found substantial and compelling reasons justified an exceptional sentence based on the aggravating factors found by the jury. The court imposed a 480-month sentence and entered a no-contact order prohibiting contact with K.M. and any minors.

ANALYSIS

Jennifer Mothershead seeks reversal of the jury conviction of assault of a child in the first degree. Mothershead contends (1) the court erred in denying her motion to suppress the eye drop medications, (2) the jury selection process violated her constitutional right to a public trial, (3) the court's evidentiary rulings violated her right to present a defense, (4) the court erred in refusing to instruct the jury on the lesser degree offense of assault of a child in the third degree and instructing the jury on "reasonable doubt" as an abiding belief, and (5) prosecutorial misconduct and cumulative error violated her right to a fair trial. In the alternative, Mothershead contends the exceptional sentence is unconstitutional, it is not supported by the evidence, and is excessive, and the court erred by imposing a no-contact order.

Motion to Suppress

Mothershead contends the court erred in denying her motion to suppress the prescription eye drop medications that Dr. Sugar directed Dr. Heistand to obtain from the cooler in K.M.'s hospital room for testing.

We review the trial court's findings of fact on a motion to suppress under the substantial evidence standard. State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). "Substantial evidence is 'evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.' " Levy, 156 Wn.2d at 733 (quoting State v. Mendez, 137 Wn.2d 208, 214, 970 P.2d 722 (1999)). "Unchallenged findings of fact are verities on appeal." Levy, 156 Wn.2d at 733 (citing State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003)). We review the trial court's conclusions of law de novo. Levy, 156 Wn.2d at 733.

Below, Mothershead argued that because Dr. Heistand and Dr. Sugar acted "at the behest of Pierce County law enforcement," the warrantless search was unconstitutional. Mothershead also argued Dr. Heistand acted at the direction of mandatory reporter Dr. Naomi Sugar who "worked closely with law enforcement."

The unchallenged findings state there is no evidence that Dr. Sugar and Dr. Heistand were acting at the direction of the police by testing the prescription eye drop medications and then providing the prescription eye drops to law enforcement.

> Harborview Medical Center hospital staff, to include but not limited to, Dr. Naomi Sugar and Dr. Justin Heistand, were not acting as an instrumentality of the State in testing, holding and then providing K.M.'s prescription eye medications to Pierce County Sheriff's Detective . . . on May 13, 2011. Harborview staff were acting as private citizens, as a private entity. There is no evidence that Harborview staff were acting at the direction of the Pierce County Sheriff's Department or any law enforcement. Detectives Anderson and Berg did not have any concerns regarding the eye medications nor were they aware of any issues or problems with the eye medications until after Dr. Heistand accessed and tested the medications and the medications were placed in the Pierce County Sheriff's Department property room. The detectives' focus and concern at the time they were at the Harborview was the subdural hematoma K.M. suffered for which no one who participated in K.M.'s care had an explanation.

The court concluded a search warrant was not required and denied the motion to suppress.

> Dr. Naomi Sugar was a medical doctor employed at Harborview Medical Center on May 12-13, 2011 and investigated suspected incidents of child abuse from a medical perspective; Dr. Sugar was not a law enforcement officer, nor was she acting at the behest or direction of law enforcement when she instructed Dr. Heistand to test the pH of the eye medications and then to package and provide the medications to the Pierce County Sheriff's Department. Harborview medical staff were acting as a private entity, as private citizens, in accessing, testing and providing K.M.'s eye medications to law enforcement on May 13, 2011.

As such, a warrant was not required for law enforcement to obtain the eye medications given to them by Harborview Medical Center staff.

We hold the undisputed facts support the decision to deny the motion to suppress.[6]

For the first time on appeal, Mothershead argues the warrantless search violated the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution because the Harborview doctors are government actors. Mothershead argues Dr. Sugar and Dr. Heistand were government actors because they were employed by a public hospital. We reject her attempt to raise a new argument for the first time on appeal. Further, because Mothershead did not raise this argument at the CrR 3.6 hearing, the record is not sufficiently developed. RAP 2.5(a); State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015); State v. Garbaccio, 151 Wn. App. 716, 731, 214 P.3d 168 (2009) (refusing to consider grounds for suppression not raised at CrR 3.6 hearing).

Right to a Public Trial

Mothershead claims the trial court violated her right to a public trial. Article I, section 22 of the Washington Constitution guarantees a criminal defendant the right to a public trial. Mothershead claims she is entitled to a new trial because the trial court ruled on for-cause challenges at a sidebar and allowed the parties to exercise preemptory challenges by written notation without analyzing the Bone-Club[7] factors.

State v. Love, 183 Wn.2d 598, 354 P.3d 841 (2015), controls. In Love, the court considered and rejected the same arguments and concluded there was no violation of the right to a public trial. Love, 183 Wn.2d at 607-08. The court held that when the

_____

[6] City of Pasco v. Shaw, 161 Wn.2d 450, 459, 166 P.3d 1157 (2007) ("unless the person conducting the inspection is a state actor," no violation of the constitutional provisions prohibiting warrantless searches occurs).

[7] State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995).

challenges are exercised in open court and a public record is made of the challenged jurors, no courtroom closure in violation of the right to a public trial occurs. Love, 183 Wn.2d at 605-07.

Here, as in Love, the record reflects no closure of the courtroom to the public, the trial court announced the selected members of the jury panel in open court, and the list of challenges was made part of the public record of the trial. See also State v. Marks, No. 91148-7, at 2 (Wash. Feb. 25, 2016) (en banc) (per curiam).

Evidentiary Rulings

Mothershead contends the trial court violated her constitutional right to present a defense by excluding other suspect evidence, excluding character evidence, and impermissibly restricting her right to introduce evidence on cross-examination.

A criminal defendant has a right under the Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution to present a defense. State v. Maupin, 128 Wn.2d 918, 924, 913 P.2d 808 (1996). However, the right to present a defense is not absolute. Montana v. Engelhoff, 518 U.S. 37, 42, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996); Maupin, 128 Wn.2d at 924-25. The right to present a defense does not extend to irrelevant or inadmissible evidence. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).

Other Suspect Evidence

Mothershead claims the trial court erred in precluding her from presenting evidence that "Matthew Bowie or another might have assaulted K.M." The record does not support her argument.

We review a trial court's decision to exclude other suspect evidence for abuse of discretion. State v. Franklin, 180 Wn.2d 371, 377 n.2, 325 P.3d 159 (2014). The court must determine whether the probative value is outweighed by other factors such as " 'unfair prejudice, confusion of the issues, or potential to mislead the jury;' " and focus the trial " 'on the central issues by excluding evidence that has only a very weak logical connection to the central issues.' " Franklin, 180 Wn.2d at 378 (quoting Holmes v. South Carolina, 547 U.S. 319, 326, 330, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

In Franklin, the court held the trial court erred in excluding other suspect evidence by considering the strength of the State's case against the defendant and requiring the defense to present direct rather than circumstantial evidence that someone else committed the crime. Franklin, 180 Wn.2d at 378-79. The court held the standard for the admission of other suspect evidence is whether there is evidence " 'tending to connect' someone other than the defendant with the crime." Franklin, 180 Wn.2d at 381 (quoting State v. Downs, 168 Wash. 664, 667, 13 P.2d 1 (1932)). "[T]he probative value must be based on whether the evidence has a logical connection to the crime—not based on the strength of the State's evidence." Franklin, 180 Wn.2d at 381-82 (citing Holmes, 547 U.S. at 330). Mere evidence of motive or motive coupled with threats of the other person " 'is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged.' " Franklin, 180 Wn.2d at 379 (quoting State v. Kwan, 174 Wash. 528, 533, 25 P.2d 104 (1933)). Further, " '[r]emote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose.' " Franklin, 180 Wn.2d at 380[8] (quoting Kwan, 174 Wash. at 533); see also Maupin, 128 Wn.2d at 927. "[S]ome combination of facts

---

[8] Alteration in original.

or circumstances must point to a nonspeculative link between the other suspect and the charged crime." Franklin, 180 Wn.2d at 381.

Below, the State filed a pretrial motion to exclude "other suspect" evidence. The State argued that before presenting other suspect evidence, Mothershead must establish a "clear nexus between the other person and the crime." In response, the defense did not identify another suspect or other suspect evidence. The defense conceded the evidence would show Mothershead was the primary caretaker but stated, "We will try to discern, via cross-examination," evidence about other individuals who administered eye medications.

> As noted previously, in the 'factual summary' above, it is expected that there will be general agreement that the defendant was K.M.'s primary care-giver; it was the defendant who, of all of the interested parties, went with her child to all of her medical appointments . . . . It was this defendant who spent every night with her child, and most of her days with her child. There were, however, others who also spent time with K.M., and there were others who administered eye medication to K.M. We will try to discern, via cross-examination, who was with K.M. when eye medication was stored and/or administered, who was with K.M. in the immediate hours before the head injury was discovered, and how the injury may have occurred.

During the pretrial hearing on motions in limine, the defense reiterated, "[T]he evidence at trial we fully expect will be that Jennifer, the defendant, was the primary caregiver, and she was the person who primarily administered medications;" and candidly admitted there was no foundation to admit other suspect evidence.

> So if I were — if I were to say other suspect, other than opportunity, I'd fall flat on a pure other suspects analysis. But as far as presenting a defense and not pointing the finger to say, "Oh, I know who did it," which I just — which — seems to me that the case law says I cannot do as defense counsel, but it's part of our defense. And that's where we are. And it's critical to our defense.

34

The court ruled that to admit other suspect evidence, the defense "must lay the proper foundation" and show a nexus between the other suspect and the crime.

> State's motion in limine No. 4, other suspect evidence. And with respect to the issue of other suspect evidence, the defendant bears the burden of showing evidence that some other suspect committed the crime. The defense must show a nexus between the other suspect and the crime. And before any such evidence is admissible, the defense must lay the proper foundation, assuring that the other suspect had the motive, ability and opportunity to commit the crime.

At trial, defense counsel asked Matthew Bowie during cross-examination whether he had medical supplies such as "[a]ce wraps, syringes, anything like that." The State objected to the question as not relevant. In response, the defense attorney conceded there was no evidence a "syringe even existed." The court sustained the objection.

The defense attorney also asked Matthew whether he offered to pay for an abortion after learning Mothershead was pregnant. The State objected to the question as not relevant. In response, defense counsel argued the question "goes to his motivation." The court ruled if "defense wants to make an offer of proof, the Court will consider that." Defense counsel did not make an offer of proof.

Before closing argument, the attorney argued the defense met its burden to show someone else committed the crime, and the defense should be allowed to argue Matthew Bowie committed the crime of assault of a child in the first degree. The court ruled the defense did not meet its burden of showing other suspect evidence. Defense counsel asked the court to clarify for purposes of closing argument. Defense counsel argued, in pertinent part:

> I don't think the Court can stop me from saying Jenny isn't the only one who might have had a motive for wanting to have an excuse to spend more time at the household. I can say that. Jenny wasn't there when the head injury occurred. I can say that. Only Matt has an explanation for the

head injury, apparently. I can say that, I believe. And then go through the facts and circumstances that I believe support what I was hoping the Court would allow me to actually argue to the jury: "Don't look at Jenny, look at Matt." But I think — I understand the Court's not going to allow me to do that.

In response, the court ruled it was "not going to dictate" the parameters and the defense was entitled to present closing argument based on the evidence.

The Court's pretrial ruling deals with admissibility of evidence. Closing arguments have its own parameters. And the Court is not going to dictate what counsel can or cannot argue to a jury, but it does have parameters. It must be in components of the evidence. And the Court's closing instructions — opening instructions as well as closing instruction to the jury — is that anything you folks, either one of you counsel say, if it's not supported by the evidence or the law, to disregard whatever it is you say. That's the Court's general instruction to the jury. I am not going to dictate your script, [Defense Counsel].

During closing argument and without objection from the State, defense counsel argued Matthew was responsible for taking care of K.M. when her eye infection first started and when her head injury was discovered. The defense argued that on March 23, "Jenny's out riding, comes back to the barn, Matt's been watching [K.M.], and [K.M.] has a red puffy eye." Defense counsel pointed out that the head injury on May 11 occurred while Matthew was taking care of K.M. and the eye medications were stored at Courtney and Matthew's house.

May 11th. The big state equestrian meet is coming up. I think it was in Moses Lake. Certainly east of the mountains. Should have been pretty apparent to you that Jenny cared very much about these high school kids she was coaching. A very important event for her. She's out, Matt's with the baby alone. Courtney's someplace. She's out for a couple of hours, up to four hours. We're not really sure. But she's gone. And she — she's getting ready for this meet. And she gets back to the house, and there are Courtney and Matt. And [K.M.] has a head injury. Doesn't seem to be affecting [K.M.]. Feeling it. Okay. Get her to the doctor. And does that. Enumclaw Medical Center, I believe it was Dr. Van Fossen, over to St. Elizabeth, and then your baby is airlifted, off in a helicopter, and

36

you can't go. You're gone all day. You get back to the Bowie household where those medications had been stored. . . .

. . . .

. . . And something happened on March 23rd. And then other stuff happened.

The trial court did not abuse its discretion in sustaining the relevancy objections to questions about whether Matthew possessed a syringe or offered to pay for an abortion. Defense counsel admitted there was no evidence a "syringe even existed," and there was no evidence Matthew knew Jennifer was pregnant with his child until after Detective Anderson and Detective Sergeant Berg interviewed Courtney on May 16, 2011.

The court did not err in ruling the defense did not meet its burden of showing the nexus required for other suspect evidence. Contrary to the repeated assertions on appeal, there was no evidence of the motive of Matthew Bowie or anyone else and no evidence connecting someone else to the crime. There is no "combination of facts or circumstances" that "point to a nonspeculative link" between someone else and the charged crime. Franklin, 180 Wn.2d at 381.

Character Evidence

Mothershead argues the trial court violated her right to present a defense by excluding evidence of her good character for peacefulness. The record does not support her argument.

We review evidentiary rulings for abuse of discretion. State v. Garcia, 179 Wn.2d 828, 846, 318 P.3d 266 (2014). A trial court abuses its discretion if its decision is manifestly unreasonable or based upon untenable grounds or reasons. Garcia, 179 Wn.2d at 846; State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)).

37

Evidence of character is generally inadmissible to prove conformity on a particular occasion. ER 404(a). However, ER 404(a)(1) permits a defendant to introduce evidence of a pertinent character trait to the crime charged. ER 405 requires such proof to be made through a witness knowledgeable about the defendant's reputation in the community for the pertinent trait. "Evidence of specific instances of conduct is admissible under ER 405(b) only if the 'character or a trait of character' is 'an essential element of a charge, claim, or defense.' " State v. Stacy, 181 Wn. App. 553, 566, 326 P. 3d 136 (2014) (quoting ER 405(b)). "Character is not an essential element of any charge, claim, or defense for the crime of assault." Stacy, 181 Wn. App. at 566.

Below, the court ruled that subject to a proper foundation, Mothershead could present reputation evidence.

> [DEFENSE COUNSEL]: I need some clarification, some guidance, Your Honor.
> THE COURT: Indeed, if I can.
> [DEFENSE COUNSEL]: I know you can.
> My witnesses, is the Court granting the State's motion that they cannot testify that [Mothershead is] a good, loving, caring mother?
> THE COURT: I'm ruling — well, it would all depend on if the defense can lay the proper foundation for that, which requires it to be a reputation in the general community and the neutral community. If it's her mother and her sibling, I think the case law is very clear that that's not a general neutral community.
> [DEFENSE COUNSEL]: That's what I wanted to clarify. One of our witnesses is grandma, and her observations of how much Jennifer loved this child and the steps she went to carry [sic] for her.
> THE COURT: I think the case law is very clear, it has to be a general, neutral community.
> [DEFENSE COUNSEL]: That's what I needed to clarify. Same thing for the calm demeanor?
> THE COURT: General community.
> [DEFENSE COUNSEL]: If that comes up.

During the cross-examination of Matthew Bowie, defense counsel asked, "Did you ever see Jennifer lose her temper and strike out in anger?" The court sustained the

State's objection on the grounds that Matthew was not part of a neutral community and the testimony related to specific instances of conduct. The trial court did not abuse its discretion by ruling Mothershead could present reputation evidence only with a proper evidentiary foundation under ER 405 or in sustaining the objection to questioning Matthew Bowie about specific instances of conduct.

<u>Self-Serving Hearsay</u>

Mothershead asserts the trial court erred by precluding Detective Sergeant Berg and Detective Anderson from testifying about statements she made to them at Harborview. Mothershead contends she was entitled to "rebut, modify or explain" testimony the State elicited on direct examination. A trial court's "limitation of the scope of cross-examination will not be disturbed unless it is the result of manifest abuse of discretion." <u>State v. Darden</u>, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002).

Pretrial, the State moved in limine to preclude the defense from eliciting self-serving hearsay statements of Mothershead. The defense conceded it was not relying on ER 106 and the rule of completeness. "I did not reference by the actual rule number. I'm talking about a due process issue, Your Honor." The defense asked the court to "reserve ruling on this until we see how it develops at trial."

On cross-examination, defense counsel asked the detectives about statements Mothershead made to them at Harborview. The State objected as self-serving hearsay. In response, the attorney argued the defense was "simply trying to clarify" and the rule of completeness allowed the introduction of "additional statements attributed to my client." The court asked the defense to provide authority that ER 106 applied to the oral statements. The record does not reflect the defense attorney provided any authority.

For the first time on appeal, Mothershead cites case law, State v. West, 70 Wn.2d 751, 424 P.2d 1014, to argue the court erred in sustaining the objection. In West, the court held:

> Where one party has introduced part of a conversation the opposing party is entitled to introduce the balance thereof in order to explain, modify or rebut the evidence already introduced insofar as it relates to the same subject matter and is relevant to the issue involved. This is true though the evidence might have been inadmissible in the first place.

West, 70 Wn. 2d at 754-55.

Because the court asked the attorney to provide authority below and Mothershead did not cite West or explain to the court how the statements were necessary to clarify or explain the testimony on direct, we decline to address the error for the first time on appeal. State v. Momah, 167 Wn.2d 140, 153-54, 217 P.3d 321 (2009) (a criminal defendant cannot seek appellate review of an error she helped create even when the alleged error involves constitutional rights).

Jury Instructions

### Inferior Degree Offense Instruction

Mothershead contends the trial court erred in refusing to instruct the jury on the lesser offense of assault of a child in the third degree. Mothershead asserts the trial court erred by analyzing the request to instruct the jury on the lesser offense as a request to instruct on a lesser included crime.

We review a trial court's decision on whether to instruct the jury on an inferior degree offense de novo. State v. Corey, 181 Wn. App. 272, 276, 325 P.3d 250 (2014) (citing State v. Fernandez-Medina, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000); State v.

40

Dearbone, 125 Wn.2d 173, 178, 883 P.2d 303 (1994)). RCW 10.61.003 allows the court to instruct on an inferior degree offense. RCW 10.61.003 states:

> Upon an indictment or information for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment or information, and guilty of any degree inferior thereto, or of an attempt to commit the offense.

A defendant is entitled to a jury instruction on an inferior degree offense only where:

> "(1) the statutes for both the charged offense and the proposed inferior degree offense 'proscribe but one offense'; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense."

Fernandez-Medina, 141 Wn.2d at 454 (quoting State v. Peterson, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)).

The State concedes the legal requirements to give an inferior degree jury instruction are met. We accept the State's concession as well taken. The statutes proscribe only one offense, the crime of assault. Chapter 9A.36 RCW. The crime of assault is divided into degrees, and third degree assault of a child is an inferior degree of assault of a child in the first degree. RCW 9A.36.120, .140.

Because the only dispute is whether there is evidence that Mothershead committed only the inferior offense of assault of a child in the third degree, our focus is on the factual prong of the test. Fernandez-Medina, 141 Wn.2d at 455. "[T]he factual test includes a requirement that there be a factual showing more particularized than that required for other jury instructions." Fernandez-Medina, 141 Wn.2d at 455. The evidence "must raise an inference that only the lesser included/inferior degree offense

41

was committed to the exclusion of the charged offense." Fernandez-Medina, 141 Wn.2d at 455.[9]

In determining whether the evidence at trial was sufficient to support the giving of an instruction, we view the supporting evidence in the light most favorable to the party that requested the instruction. Fernandez-Medina, 141 Wn.2d at 455-56. We must consider all the evidence at trial, but the evidence must affirmatively establish the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt. Fernandez-Medina, 141 Wn.2d at 456. The evidence must " 'permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater.' " Fernandez-Medina, 141 Wn.2d at 456 (quoting State v. Warden, 133 Wn.2d 559, 563, 947 P.2d 708 (1997)).

Under RCW 9A.36.140(1), a person is guilty of the crime of assault of a child in the third degree if "the person commits the crime of assault in the third degree as defined in RCW 9A.36.031(1)(d) or (f) against a child." A person is guilty of third degree assault under RCW 9A.36.031(1)(d) if with "criminal negligence," the person causes bodily harm to another "by means of a . . . thing likely to produce bodily harm." A person is guilty of third degree assault under RCW 9A.36.031(1)(f) if with "criminal negligence," the person "causes bodily harm accompanied by substantial pain that extends for a period sufficient to cause considerable suffering." A person acts with "criminal negligence" when "he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(d).

---

[9] Emphasis in original.

Mothershead concedes that "affirmative evidence allowed a reasonable inference that Ms. Mothershead did actually assault K.M. by administering drops from a contaminated version of the May 2 prescription," but argues that the evidence shows "she did not do so repeatedly from March 23 to May 12." Mothershead also argues that because only the May 2, 2011 eye drop medication was tested and she testified that she administered drops from the May 2 prescription "only a few times," she did not inflict great bodily harm, physical pain, or agony equivalent to that of torture.

Even in the light most favorable to Mothershead, the evidence does not support her argument that she committed only assault of a child in the third degree to the exclusion of assault of a child in the first degree.

There is no evidence that Mothershead negligently administered contaminated eye drops. The evidence established Dr. Weiss prescribed the eye medications on April 26, 2011 and Mothershead obtained a refill at Children's pharmacy on May 2, 2011. The Children's pharmacy compounded the eye medications specifically for K.M. in a secure, sterile, bleach-free environment. Children's pharmacy received the medications sealed from the manufacturer and no manufacturer recalled the eye medications because of contamination. We conclude the court did not err in refusing to instruct the jury on the inferior degree offense of assault of a child in the third degree.

Reasonable Doubt Instruction

Mothershead contends the court erred in giving a jury instruction that defined "reasonable doubt" as "an abiding belief in the truth of the charge." The court used 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 4.01, at 85 (3d

43

ed. 2008) (WPIC), to instruct the jury on reasonable doubt.[10] In State v. Bennett, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007), the Washington Supreme Court expressly approved the use of WPIC 4.01 as a correct statement of the law. The court states the "abiding belief" language in a reasonable doubt instruction was previously approved in State v. Pirtle, 127 Wn.2d 628, 656-58, 904 P.2d 245 (1995). Bennett, 161 Wn.2d at 317. "We have approved WPIC 4.01 and concluded that it adequately permits both the government and the accused to argue their theories of the case." Bennett, 161 Wn.2d at 317 (citing Pirtle, 127 Wn.2d at 656-58).

Mothershead cites State v. Emery, 174 Wn.2d 741, 278 P.3d 653 (2012), and State v. Lindsay, 180 Wn.2d 423, 326 P.3d 125 (2014), to argue that by equating reasonable doubt with an abiding belief, WPIC 4.01 dilutes the State's burden of proof in violation of the right to a fair trial. Neither Emery nor Lindsay support Mothershead's argument.

In Emery, the prosecutor argued, " 'Members of the jury, I ask you, go back there to deliberate, consider the evidence, use your life experience and common sense, and speak the truth by holding these men accountable for what they did.' " Emery,174 Wn.2d at 751. The Supreme Court held the argument to "speak the truth" was improper.

> The jury's job is not to determine the truth of what happened; a jury
> therefore does not "speak the truth" or "declare the truth." Rather, a jury's

---

[10] Jury instruction 2 states, in pertinent part:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

job is to determine whether the State has proved the charged offenses beyond a reasonable doubt.

Emery, 174 Wn.2d at 760.[11] Likewise, in Lindsay, the court held, "Telling the jury that its job is to 'speak the truth,' or some variation thereof, misstates the burden of proof and is improper." Lindsay, 180 Wn.2d at 437.

Unlike "speak the truth," the abiding belief language used in WPIC 4.01 accurately informs the jury its "job is to determine whether the State has proved the charged offenses beyond a reasonable doubt." Emery, 174 Wn.2d at 760. The reasonable doubt instruction accurately stated the law and did not dilute the State's burden of proof.

Prosecutorial Misconduct

Mothershead contends prosecutorial misconduct during closing argument requires reversal. Mothershead asserts the prosecutor misstated and improperly shifted the burden of proof.

To prevail on a claim of prosecutorial misconduct, a defendant must show the prosecutor's argument was both improper and prejudicial. State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). An abuse of discretion standard applies to allegations of prosecutorial misconduct. Lindsay, 180 Wn.2d at 430. In analyzing prejudice, "we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." Emery, 174 Wn.2d at 764 n.14. If a defendant does not object at trial, the defendant is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Emery, 174 Wn.2d at

---

[11] Citation omitted.

760-61. If a defendant objects at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. Emery, 174 Wn.2d at 760.

Mothershead claims the prosecutor misstated and trivialized the State's burden of proof by equating the "reasonable doubt standard" as "comparable to that a parent uses in deciding whether his child ate the brownies missing from the kitchen." The record does not support her argument.

Jury instruction 3 defines direct and circumstantial evidence. Jury instruction 3 states:

> The evidence that has been presented to you may be either direct or circumstantial. The term "direct evidence" refers to evidence that is given by a witness who has directly perceived something at issue in this case. The term "circumstantial evidence" refers to evidence from which, based on your common sense and experience, you may reasonably infer something that is at issue in this case.
> The law does not distinguish between direct and circumstantial evidence in terms of their weight or value in finding the facts in this case. One is not necessarily more or less valuable than the other.

At the beginning of closing argument, the prosecutor asked the jury to "keep Instruction No. 3 in mind as a kind of framework . . . as you listen to my closing argument, [defense counsel]'s closing argument, and as you go back into the jury room and deliberate." In describing the difference between direct and circumstantial evidence as defined by the jury instruction, the prosecutor used as an example a child taking a brownie from a batch of brownies.

> Just as an example of direct versus circumstantial evidence, you bake a batch of brownies and you leave them on your kitchen counter to cool. Big stack of them. When you leave the kitchen, you see your five-year-old son sitting at the counter staring at those brownies intently. You leave the kitchen. Five, ten minutes you come back. Your son is not in the kitchen any longer, but you notice that the stack seems smaller than

46

when you left it a few minutes ago. In the living room there's your son sitting on the couch watching TV. You look a little closer. He's got a little smudge on his cheek. Remote control's kind of sticky. You didn't see him take anything, you didn't see him actually eat it, but what can you reasonably infer based on what you did see? Chocolate on his face, sticky remote control. You ask him and he shakes his head, "No, I didn't do it." He even points to the poor dog, Sammy, at his feet. "Sammy did it." Again, what's the reasonable inference? Are there other possibilities? There will always be other possibilities. But what's the reasonable conclusion based on what you do have? That your son ate the brownies.

There's a reason why the law tells you that you can make these reasonable inferences. Because you have to.

The prosecutor did not misstate or trivialize the burden of proof by using the brownie example to describe direct versus circumstantial evidence.

Mothershead contends the prosecutor improperly shifted the burden of proof during closing argument. An argument that shifts the State's burden to prove guilt beyond a reasonable doubt constitutes misconduct. State v. Thorgerson, 172 Wn.2d 438, 453, 258 P.3d 43 (2011); State v. Gregory, 158 Wn.2d 759, 859-61, 147 P.3d 1201 (2006). "A criminal defendant has no burden to present evidence, and it is error for the State to suggest otherwise." State v. Montgomery, 163 Wn.2d 577, 597, 183 P.3d 267 (2008).

However, a prosecutor has wide latitude to comment on the evidence introduced at trial and to draw reasonable inferences from the evidence. Thorgerson, 172 Wn.2d at 448. A prosecutor is also entitled to point out the improbability or lack of evidentiary support for the defense theory of the case. State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). An argument that the "defense evidence is lacking does not constitute prosecutorial misconduct or shift the burden of proof to the defense." State v. Jackson, 150 Wn. App. 877, 885-86, 209 P.3d 553 (2009). A defendant must object

contemporaneously to the prosecutor's improper comments during closing argument. State v. Klok, 99 Wn. App. 81, 85, 992 P.2d 1039 (2000).

Mothershead contends the prosecutor improperly shifted the burden by arguing Mothershead "never said she didn't put anything into [K.M.]'s eye drops. She said that she didn't know anything about the change of color, no personal knowledge about that or the toxic smell." The prosecutor argued, in pertinent part:

> The defendant actually had excellent recall of a lot of details, even highly insignificant ones. Almost like she rehearsed it. Like she knew what she had to say and what she should say and how she should say it. But I submit to you — and I want to emphasize that you are the fact finders, you are the jury listening to everything that was said, you are allowed to take notes. And if you recall it differently than this, you recall it differently than this. But I submit to you that she never said she didn't put anything into [K.M.]'s eye drops. She said that she didn't know anything about the change of color, no personal knowledge about that or the toxic smell.

Mothershead did not object.

The prosecutor's argument accurately states Mothershead's testimony and draws reasonable inferences from the evidence. Contrary to the testimony of the State's witnesses, Mothershead testified the Tobramycin eye drops did not have a noxious smell and were "clear" in color. At the end of direct examination, defense counsel asked Mothershead, "Do you have any personal knowledge as to what's been described from these drops of being a dark color and smell and all that stuff?" In response, Mothershead said, "No. That's nothing that I've seen." Further, because defense counsel did not object and the argument is not flagrant or ill intentioned, any

48

error is waived.[12]

In rebuttal, in response to the defense argument that Mothershead was unaware of any problem with the medications, the prosecutor argued, "But again, . . . I submit to you that . . . [t]he defendant never said that she didn't intentionally do something to the drops."

> Defense counsel argues that you don't have an intentional assault if there was something wrong with the medications and the defendant didn't know about it. You know, she's being prescribed this medication, doing what the doctor tells her and giving her medications. But again, I submit to you, I submit to you that this is the case. The defendant never said that she didn't intentionally do something to the drops.

The defense objected on the grounds of "[b]urden shifting." The court overruled the objection.

During rebuttal argument, the prosecutor "is entitled to make a fair response to the arguments of defense counsel." State v. Gauthier, 189 Wn. App. 30, 37, 354 P.3d 900 (2015); Gregory, 158 Wn.2d at 842; Russell, 125 Wn.2d at 87. Even where the comments are improper, the remarks by the prosecutor are not grounds for reversal " 'if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective.' " State v. Weber, 159 Wn.2d 252, 276-77, 149

---

[12] In closing, the defense attorney argued, in pertinent part:

> Did Jenny assault her child? [Jury Instruction] No. 8. An assault is an intentional touching of another person with unlawful force. If there were something wrong with the medication, for whatever reason, and Jenny didn't know about it, is that an assault? I suggest to you if you look at the instructions, look at them very carefully, the answer is no. Even if you think in your spot, you know what, this is going on with my kid, it's getting better, then gets worse, oh my gosh, almost all better, now it's getting so much worse, now this. If I can drive to Seattle, I can drive to Portland, or I can drive someplace else. She's not required to do that. And that's not part of the charge. And I wanted to make that clear to you. It's something we'd like to feel and we might think about. Or maybe I'm the only one. But you do what the doctors tell you to do, especially when you're convinced or you're told these are the best there are. And you keep doing that. And you go to the best because you really care about your daughter and you want things to happen.

P.3d 646 (2006) (quoting Russell, 125 Wn.2d at 86); Gauthier, 189 Wn. App. at 38.

Here, the record shows the prosecutor's argument was in pertinent reply to the

argument of defense.

Cumulative Error

Mothershead seeks reversal on the grounds of cumulative error. Where, as

here, there are few or no errors and errors, if any, have little or no effect on the outcome

of the trial, reversal is not required. Weber, 159 Wn.2d at 279.

Exceptional Sentence

In the alternative, Mothershead argues the aggravating factors of "deliberate

cruelty" under RCW 9.94A.535(3)(a) and "particularly vulnerable" under RCW

9.94A.535(3)(b) are unconstitutionally vague and violate double jeopardy, insufficient

evidence supports the jury finding the aggravating factors, and the 480-month sentence

imposed by the court is clearly excessive. Mothershead also challenges the order

prohibiting her from having contact with minors.

In State v. Baldwin, 150 Wn.2d 448, 459, 78 P.3d 1005 (2003), the Washington

Supreme Court held, "[D]ue process considerations that underlie the void-for-vagueness

doctrine have no application in the context of sentencing guidelines." The court states

the sentencing guideline statutes do not define conduct, permit arbitrary arrest and

criminal prosecution, inform the public of penalties attached to criminal conduct, vary

the statutory maximum or minimum penalties that the legislature assigned to illegal

conduct, or set penalties. Baldwin, 150 Wn.2d at 459.

Mothershead relies on Alleyne v. United States, ___ U.S. ___, 133 S. Ct. 2151,

186 L. Ed. 2d 314 (2013); Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L.

Ed. 2d 403 (2004); and Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), to argue Baldwin is incorrectly decided. We disagree.

Alleyne, Blakely, and Apprendi concern the right to a jury trial. The right to a jury trial is distinct from the vagueness doctrine that provides public notice and prevents arbitrary State intrusion. Baldwin, 150 Wn.2d at 458. Under Alleyne, Blakely, and Apprendi, a court may not impose a sentencing enhancement without either findings by the jury or a stipulation by the defendant. Alleyne, 133 S. Ct. at 2163; Blakely, 542 U.S. at 303-04; Apprendi, 530 U.S. at 490.

We hold Baldwin precludes Mothershead from challenging the "deliberate cruelty" and "particularly vulnerable" aggravating factors on vagueness grounds. These aggravating circumstances do not define conduct, authorize arrest, inform the public of criminal penalties, or vary legislatively defined criminal penalties.

In State v. Kelley, 168 Wn.2d 72, 82, 226 P.3d 773 (2010), our Supreme Court held Apprendi, Blakely, and Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 242, 8153 L. Ed. 2d 556 (2002), do not implicate the double jeopardy clause. Because the same reasoning applies to Alleyne, we reject the argument that imposition of an exceptional sentence based on the aggravating circumstances found by the jury violate the void for vagueness doctrine or double jeopardy.

Next, Mothershead claims insufficient evidence supports the jury findings on the aggravating factors, and imposition of the exceptional sentence is clearly excessive. In reviewing an exceptional sentence, we must (1) determine whether the record supports the special verdict on the aggravating circumstance under a clearly erroneous standard, (2) determine de novo whether the reasons for imposing an exceptional sentence are

51

substantial and compelling, and (3) determine whether the court abused its discretion by imposing a sentence that is clearly excessive or clearly too lenient under an abuse of discretion standard. RCW 9.94A.585(4); State v. Fowler, 145 Wn.2d 400, 405-06, 38 P.3d 335 (2002).

Under RCW 9.94A.535(3), if a jury finds any of several enumerated aggravating factors, a trial court has substantial and compelling reasons to impose an exceptional sentence. Here, because the court expressly based the exceptional sentence on the jury finding three statutory aggravating factors—deliberate cruelty under RCW 9.94A.535(3)(a); particularly vulnerable under RCW 9.94A.535(3)(b); and position of trust, confidence, or fiduciary responsibility under RCW 9.94A.535(3)(n)—our inquiry is limited to whether the record supports the special verdicts and, if so, whether the sentence imposed was clearly excessive.

Mothershead asserts insufficient evidence supports the jury finding aggravating circumstances based on "deliberate cruelty" and "particular vulnerability." We review the jury's special interrogatories under a sufficiency of the evidence standard. State v. Yates, 161 Wn.2d 714, 752, 168 P.3d 359 (2007). Evidence is sufficient to prove the aggravating circumstance if after viewing the evidence in the light most favorable to the State, any rational jury could find the facts to support an aggravating circumstance beyond a reasonable doubt. RCW 9.94A.537(3); Yates, 161 Wn.2d at 752. A challenge to the sufficiency of the evidence admits the truth of the State's evidence and any inferences the jury may reasonably draw from it. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the trier of fact on "issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v.

Fiser, 99 Wn. App. 714, 719, 995 P.2d 107 (2000); State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Jury instruction 16 defines "deliberate cruelty" to mean "gratuitous violence or other conduct which inflicts physical, psychological, or emotional pain as an end in itself, and which goes beyond what is inherent in the elements of the crime."[13] When viewed in the light most favorable to the State, the evidence showed Mothershead repeatedly administered to K.M. eye medications that were contaminated with bleach. The evidence showed K.M. "cried," "screamed," and "fought" when Mothershead administered the eye drops. Jennifer told Detective Anderson and Detective Sergeant Berg that she knew K.M. was "in a lot of pain." A rational jury could find physical, psychological, or emotional pain beyond that inherent in the elements of assault of a child in the first degree.

Mothershead argues the evidence does not support the jury finding that K.M. was particularly vulnerable because the legislature necessarily considered the age of the victim when establishing the standard sentence range for assault of a child in the first degree. RCW 9A.36.120(1). However, even when the statute applies only to children, the victim's age may be an aggravating factor if the victim's extreme youth makes the victim more vulnerable than other victims of the same crime. State v. Fisher, 108 Wn.2d 419, 424, 739 P.2d 683 (1987); State v. Russell, 69 Wn. App. 237, 251-52, 848 P.2d 743 (1993).

When viewed in the light most favorable to the State, a rational jury could find that K.M. was particularly vulnerable. Mothershead admitted she was the primary caretaker of 13-month-old K.M., responsible for administering the eye drops, and

---

[13] Mothershead concedes jury instruction 16 is a correct statement of the law.

enlisted the help of others to hold K.M. down while doing so. The evidence established K.M. was in a great deal of pain and the condition of her eyes was "horrific."

Mothershead asserts her 480-month sentence is clearly excessive because it is four times the standard range.

An exceptional sentence is not clearly excessive because it exceeds the standard sentencing range. See State v. Branch, 129 Wn.2d 635, 649-51, 919 P.2d 1228 (1996). A sentence is clearly excessive only if the trial court abused its discretion in establishing the length of the sentence. State v. Ferguson, 142 Wn.2d 631, 651, 15 P.3d 1271 (2001). In determining whether an exceptional sentence is clearly excessive, we determine whether the trial court abused its discretion by relying on an impermissible reason or unsupported facts, or whether the sentence is so long that in light of the record, it shocks the conscience of the reviewing court. State v. Halsey, 140 Wn. App. 313, 324, 165 P.3d 409 (2007).

Here, the trial court ruled:

[Mothershead]'s actions in repeatedly, multiple times a day over a period of weeks, placing a toxic substance into K.M.'s eyes causing permanent damage to K.M.'s vision demonstrated deliberate cruelty. This assault on K.M. was not an incident that occurred in a spur of the moment loss of temper or out of pent up frustration. Rather, this was a prolonged assault of K.M.'s eyes over weeks without regard to the obvious pain and injury caused to K.M.

The court also found Mothershead "knew or should have known that K.M. was particularly vulnerable given her very young age . . . and in the defendant's custody." Before imposing an exceptional sentence, the court noted:

Ms. Mothershead, you yourself said you always put your emotions in check. But I watched you while you testified. I watched you while you were looking at the evidence presented to the jury. And you are a very calm, stoic — as you put it — person. But there was points during your

54

testimony where I saw your face light up, and I saw joy wash over your face, and there was a twinkle in your eye. And those were the times you were talking about horses. In fact, it happened in front of me today. You gave a long speech, and you smiled only when you were talking about horses. Not while you were talking about those good times you were having with [K.M.] or your love for [K.M.] or [E.B.]. It was only about the horses. That's what the Court saw, that's what the Court heard.

The court did not err in concluding the special verdict jury findings on the aggravating factors constituted "substantial and compelling reasons justifying an exceptional sentence outside the standard range" because Mothershead "repeatedly placed a toxic substance in K.M.'s eyes and used her position of trust as K.M.'s mother with primary physical custody and primary caretaking duties to do so" and imposing a 480-month sentence.

Mothershead challenges the order prohibiting her from having contact with minors. Mothershead argues the prohibition is not crime related and the court abused its discretion by imposing a no-contact order "with any minors for lifetime."

Under former RCW 9.94A.505(8) (2010),[14] the court may "impose and enforce crime-related prohibitions" as part of a sentence. "Crime-related prohibition" means "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). We review imposition of crime-related prohibitions for an abuse of discretion. Warren, 165 Wn.2d at 32.

Mothershead asserts the no-contact order with any minors is not a crime-related prohibition because the jury convicted her of assaulting her own child, not other children. However, "[n]o-contact orders are not limited to the victims of the crime." State v. Navarro, 188 Wn. App. 550, 556, 354 P.3d 22 (2015). " 'Prevention of harm to

---

[14] LAWS OF 2010, ch. 224, § 4.

55

children is a compelling state interest.' " <u>State v. Aguilar</u>, 176 Wn. App. 264, 277, 308 P.3d 778 (2013) (quoting <u>State v. Ancira</u>, 107 Wn. App. 650, 653-54, 27 P.3d 1246 (2001)).

Mothershead also challenges the duration of the no-contact order. <u>Ancira</u> is distinguishable. In <u>Ancira</u>, we held the trial court abused its discretion by entering a no-contact order prohibiting a defendant from having contact with his own children as not "reasonably necessary to prevent harm to the children." <u>Ancira</u>, 107 Wn. App. at 653-57. Unlike in <u>Ancira</u>, the court concluded a no-contact order with any minors for life was reasonably necessary to prevent harm to children.

We affirm the jury verdict and the judgment and sentence.

WE CONCUR: