# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

THOMAS M. GAUTHIER,

Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 71631-0-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: June 22, 2015

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2015 JUN 22 AM 8:26

LAU, J. — Thomas Gauthier appeals his conviction for rape in the second degree. He argues (1) the prosecutor committed misconduct in closing argument, (2) he received ineffective assistance of counsel, and (3) prior convictions included in his offender score "washed out" under RCW 9.94A.525(2)(c). In a pro se statement of additional grounds, Gauthier alleges five other grounds for review. We conclude the prosecutor's rebuttal closing argument was a fair response to defense counsel's closing argument, Gauthier received effective assistance of counsel, and the trial court properly calculated Gauthier's offender score. And because Gauthier's statement of additional grounds presents no independent basis for reversal, we affirm the judgment and sentence.

## FACTS

Evidence at trial shows the following facts: In 2001, TA worked two jobs as a medical assistant and a waitress at Rascal's Casino in South Seattle. TA did not own a car, so she walked the few blocks from her apartment to work at the casino.

On April 22, 2001, at about 3:00 a.m., TA was walking home from the casino along Des Moines Memorial Drive. TA said she was suddenly pushed from behind over a guardrail by an unknown assailant. She tried to dissuade the attacker from raping her by telling him she was having her period, and removed her tampon to prove it. She testified that he forced her to remove her pants, grabbed her neck, and demanded she perform oral sex. He threatened to hurt her if she resisted. He ejaculated and fled as TA was "spitting all over the place." Report of Proceedings (RP) (Nov. 19, 2013) at 406-07.

TA knocked on her neighbors' doors for help but no one answered. She got a knife from her apartment and went outside to look for her attacker, intending to kill him.

TA received a call from her sister's boyfriend, Donald Brown, whom she knew from childhood. Crying, she asked Brown to come over. When he arrived, she told him she had been raped. Brown saw a scratch mark on TA's neck. They both drove around the area in Brown's car looking for the attacker. TA called 911 the next day.

Police collected TA's clothing and examined the scene where the attack occurred. They noticed an area where the foliage was matted down. Detectives also found a tampon lying on the ground. Detectives observed grass stains on TA's right leg, upper right pocket, back pocket, and dirt stains on her lower leg. They also saw bruising on her upper arms and hip.

TA worked with a sketch artist to create an image of her attacker. Relying on this sketch, police stopped Thomas Gauthier on June 28, 2001. Gauthier told the detectives about his recent release from jail and gave them his address. At the time, he had no further contact with police.

In August 2001, the crime lab tested a semen sample from the jacket TA wore on the night of the attack. Police were unable to match the sample to a known DNA profile. TA met with detectives and identified one person in a photo montage, but the suspect's DNA did not match the profile from TA's jacket.

In 2008, the Combined DNA Index System (CODIS) returned a match between the DNA sample found on TA's jacket and Gauthier's DNA. Police located Gauthier in Arizona and returned him to Washington for trial on the second degree rape charge.

At trial, Gauthier admitted that in 2001 he was addicted to crack cocaine, struggled to keep a job or driver's license, and often sought sex from prostitutes. When he was contacted by detectives in 2008, Gauthier said he was surprised and amused that he was suspected of rape.

Gauthier initially denied recognizing TA's photograph. Later on, he claimed to remember more details about his interactions with TA. Gauthier testified that he first met TA in a grocery store parking lot where he was waiting to buy crack cocaine from a dealer. When his dealer failed to arrive, he asked TA if she could get him the drugs and she agreed. Gauthier said he gave TA $60, but she never returned with either the drugs or money.

Gauthier said the next time he saw TA was on Des Moines Memorial Drive between 2:30 or 3:00 a.m. He asked her whether she had crack, and she said she did

not. She refused when he asked her if she would perform oral sex for $20. TA consented when Gauthier offered her $50. They both stepped over the guardrail and TA performed oral sex. Gauthier testified that he eventually recognized her from their prior encounter and decided not to pay her. Gauthier denied raping TA.

A jury convicted Gauthier of second degree rape and we reversed the conviction. State v. Gauthier, 174 Wn. App. 257, 298 P.3d 126 (2013). On retrial, he was convicted as charged. He appeals.

## ANALYSIS

### Prosecutorial Misconduct in Rebuttal Closing Argument

Gauthier alleges that the prosecutor committed misconduct by appealing to the passions and prejudices of the jury during closing argument.

During closing, defense counsel argued that the jury should doubt TA's credibility. For instance, he pointed out inconsistencies in her statements to the police. He argued the lack of damage to her nylon stockings was reason to doubt that a struggle occurred. The record shows that Gauthier's defense at trial portrayed TA as a prostitute, a drug user, a liar and thief who agreed to a sex act in exchange for money and deservedly got ripped off by Gauthier because she had previously stolen from him. Defense counsel argued in closing, TA was "really angry because she didn't get paid her money." RP (Nov. 25, 2013) at 582. "You will see nowhere, as I mentioned before, in your instructions that lying to a prostitute, agreeing to pay them money, and not paying them money, is rape." RP (Nov. 25, 2013) at 597.

In rebuttal closing, the prosecutor responded by arguing that "[t]here is not one iota, one piece, one shred of evidence, besides the testimony of this man, that [TA]

-4-

worked as a prostitute on April 22nd or any other day of her life." RP (Nov. 25, 2013) at

605-06. The prosecutor also argued:

> The defense is almost like a cliché: She is a slut, she is a prostitute, she was out there, you know what, she had it coming. That is what this man is saying. She looked like a prostitute. Why? What about the way that she dressed in jeans, and white tennis shoes, and big puffy jacket makes her look like she is out there, working the streets? And you can tell it from behind? Three blocks away, in the dark. She looked like a drug dealer, she looked like a prostitute? That is laughable.
>
> She was standing, because she was walking in the dark by herself? She must have wanted it. She had it coming. This is why people don't report, because they are called sluts, whores, and prostitutes. And counsel says she had the motivation.
>
> Twelve people sitting in the box are going to decide [are] you looking at a prostitute that night? Well, that's just an absurd belief that that is what motivated [TA] to get up on this stand and talk about the most humiliating, degrading and violent thing that ever happened to her.
>
> You saw those tears. You think that is because she is afraid that somebody thinks she is a prostitute? She wasn't even asked that question until she got in this courtroom. You know that is true because none of the investigators thought she was a prostitute.
>
> . . . .
>
> So, where is her motivation for the last twelve and-a-half years before she got on that stand, to meet with the detectives, to look at the montages, to give up her blood sample, shown montages and more montages, and coming in for the interviews? Where is her motivation to get up on that stand and lie, lie about what this man did to her, if it's not true.

RP (Nov. 25, 2013) at 607-08.

> He saw his opportunity in [TA] when she was alone, when she was isolated, when she was vulnerable on that street. And he took advantage of her. And he thinks that if he calls her a slut and a prostitute, that you are going to be distracted and think, well, maybe she did have it coming, to be out there. Maybe there is something else going on. But, there is no evidence of that.

RP (Nov. 25, 2013) at 609-10.

Defense counsel did not object to any of these remarks.

Gauthier contends that when the State asserted his defense was a "cliché" and "this is why people don't report," it introduced evidence outside the record by asking the jury to consider the problem that women's rape allegations are sometimes not believed. Br. of Appellant at 7. He argues the prosecutor cast him as the "villain in the ongoing battle against sexism," thereby encouraging the jury to convict him based on an emotional response rather than the evidence. Br. of Appellant at 8-9. We disagree.

A defendant claiming prosecutorial misconduct bears the burden of establishing both the impropriety of the comments and their prejudicial effect. State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994). Even where the defendant proves improper conduct, misconduct does not constitute prejudicial error unless there is a substantial likelihood it affected the jury's verdict. State v. Stenson, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997). Where, as here, defense counsel fails to object at trial, any error is waived except where the conduct is so "flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." Stenson, 132 Wn.2d at 719. Indeed, the absence of an objection strongly suggests that the argument did not appear critically prejudicial to the appellant in the context of trial. State v. McKenzie, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006).

The prosecutor is entitled to make a fair response to the arguments of defense counsel. State v. Brown, 132 Wn.2d 529, 566, 940 P.2d 546 (1997). Even where the comments are improper, the remarks by the prosecutor are not grounds for reversal "if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." Russell, 125 Wn.2d at 86.

Viewed in the context of the evidence at trial and defense counsel's closing remarks, the prosecutor's rebuttal closing remarks constitute a fair response to defense counsel's closing arguments. A fair reading of the arguments indicate that none of the prosecutor's remarks were calculated or intended to inflame the passions or prejudices of the jury. They were properly responsive to defense counsel's summation that TA was a prostitute, drug user, liar and a thief.

As to the "cliché" and "why people don't report" remarks, these brief, isolated comments were not part of a well developed theme. Gauthier overstates the remarks' impact on the jury when viewed in context. And none of the cases he analogizes to support his misconduct claim. For example, unlike in the present case, State v. Powell, 62 Wn. App. 914, 918-19, 816 P.2d 86 (1991) involved a prosecutor's argument that acquittal would send a message that children who report sexual abuse would not be believed, "thereby declaring open season on children." That court held that the argument constituted prejudicial misconduct.

But even assuming the remarks were improper, Gauthier fails to establish the statements were so flagrant or ill-intentioned that any prejudice could not have been cured by a timely objection. It is far from certain that the trial court would have sustained an objection. Even if defense counsel had objected, the court would have instructed the jury to disregard these remarks. Defense counsel's decision not to object or request a curative instruction "strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial." State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990).

Furthermore, the trial court instructed the jury that the lawyer's arguments were not evidence:

> Keep in mind that a charge is only an accusation. The filing of a charge is not evidence that the charge is true. Your decisions as jurors must be based solely upon the evidence presented during these proceedings.
>
> . . . .
>
> The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

Clerk's Papers (CP) at 62-63. The court further instructed the jury that it was obligated to reach a decision based on the facts and the law, and not on sympathy, prejudice, or personal preference. The jury is presumed to follow the trial court's instructions. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001).

Gauthier fails to establish that the prosecutor's comments were improper. Even assuming the comments were improper, however, he fails to show that a contemporaneous objection and timely curative instruction would not have neutralized any prejudice. His claim is therefore waived.

Ineffective Assistance of Counsel

Gauthier argues in the alternative that his attorney's failure to object or request a mistrial in response to the prosecutor's closing remarks constitutes ineffective assistance of counsel. Br. of Appellant at 14-15. We disagree.

We review claims of ineffective assistance of counsel de novo. State v. A.N.J., 168 Wn.2d 91, 109, 225 P.3d 956 (2010). To establish ineffective assistance of counsel, a defendant must prove two elements: (1) defense counsel's representation

was deficient because it fell below an objective standard of reasonableness, and if established, (2) the deficient performance prejudiced him. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Failure to establish either prong ends the inquiry. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). To prevail on an ineffective assistance of counsel claim, a defendant must overcome a strong presumption that counsel's performance was reasonable. State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

For the reasons discussed above, Gauthier fails to establish prejudicial deficient performance by his trial counsel.

Offender Score

Gauthier contends that the trial court improperly calculated his offender score by failing to recognize that his prior convictions "washed out" pursuant to RCW 9.94A.525(2)(c).

Under the "washout" provision, RCW 9.94A.535(2)(c),[1] class C prior felony convictions are excluded in a defendant's offender score if since the last date of release from confinement pursuant to a felony conviction or entry of the judgment and sentence, the offender spent five consecutive years "in the community" without committing any crime that subsequently results in a conviction. Gauthier has five prior class C felony convictions listed below.[2] His last release date happened in June 2007. In other words,

---

[1] The parties agree that the material language of the statute, currently codified at RCW 9.94A.525(2)(c), is identical to the statute in effect in 2001. See former RCW 9.94A.360(2) (2001).

[2] The five prior class C felony convictions included in Gauthier's offender score are as follows:
  (1) Possession of Cocaine (Sentencing on 12/20/1996)
  (2) Taking Motor Vehicle without Permission (Sentencing on 6/15/2001)

-9-

if Gauthier had remained in the community for five years after June 2007 and remained crime free for those five years, his prior class C felony convictions would not count in his offender score after June 2012.

But he did not remain crime free for five years. He was charged with the rape of TA on March 13, 2009, and taken into custody to the King County Correctional Facility on July 23, 2010. There he remained through his first trial on May 2011 which resulted in a conviction on June 2. He was subsequently sentenced on July 8, 2011. The sentencing court calculated his offender score as a five based on his five prior class C felony convictions.

The first conviction was reversed on appeal and he was transported back to the King County Correctional Facility from prison. The jury convicted Gauthier on retrial on November 26, 2013. At sentencing on February 14, 2014, Gauthier asserted that his five prior class C felonies should not be included in his offender score because he spent 43 months in custody before he was convicted again on the present offense. He claimed that under the "washout" statute, the "in the community" phrase includes the 43 months he spent in custody on this offense, thus his offender score is zero not five. The sentencing court rejected this argument, calculated his offender score as five, and sentenced him to 120 months with credit for all time served back to July 2010, the date he was first arrested.

---

(3) Taking Motor Vehicle without Permission 2 (Sentencing 3/17/2006)
(4) Taking Motor Vehicle without Permission 2 (Sentencing 3/17/2006)
(5) Taking Motor Vehicle without Permission 2 (Sentencing 4/13/2007)
CP at 84.

Gauthier relies on State v. Ervin, 169 Wn.2d 815, 239 P.3d 354 (2010). There, the parties disagreed on whether the 17 days Ervin spent in custody during a 6 year, 3 month period interrupted the 5 year washout period. The State argued the 17 days Ervin spent in jail for a misdemeanor probation violation interrupted the 5 year washout period. Our Supreme Court concluded, "we hold that time spent in jail pursuant to violation of probation stemming from a misdemeanor does not interrupt the washout." Ervin, 169 Wn.2d at 826. The court relied on In re Personal Restraint of Nichols, 120 Wn. App. 425, 85 P.3d 955 (2004). In Nichols, the court addressed whether 20 days spent in custody on a misdemeanor interrupted the washout period that began in 1989 and would have continued until 1999. The court held that the 20 days did not "interrupt" the five year washout period.

We are not persuaded by Gauthier's attempt to extend Ervin's holding to the circumstances here. We have found no case, and Gauthier cites to none, where Ervin's limited holding was applied to time spent in confinement while awaiting resolution of a felony charge. That is the precise circumstance present here. As the State correctly points out, Gauthier's interpretation creates an absurd scenario—a defendant's offender score will actually go down while he is in custody pending trial or pending sentencing. Indeed, that is an absurd result and a result we are confident the legislature did not intend.[3]

---

[3] Adoption of Gauthier's interpretation means that a defendant could strategically lower his offender score while in custody by delaying his trial or sentencing. We decline to adopt a rule that produces such an absurd result.

Statement of Additional Grounds

Gauthier filed a pro se statement of additional grounds (SAG) alleging five additional grounds for review.

Gauthier first asserts that the trial court violated his right to a public trial by dismissing juror 5 after defense counsel observed him sleeping during trial. RP (Nov. 19, 2013) at 393. A courtroom closure occurs only when the courtroom is "completely and purposefully closed to spectators so that no one may enter and no one may leave." State v. Lormor, 172 Wn.2d 85, 93, 257 P.3d 624 (2011). Our review shows the court dismissed juror 5 on the record. RP (Nov. 19, 2013) at 430. No closure occurred.

Gauthier argues that the trial court erred by requiring him to prove the defense of consent by a preponderance of the evidence, citing State v. W.R., Jr., 181 Wn.2d 757, 765, 336 P.3d 1134 (2014). Despite Gauthier's claim, however, the court properly instructed the jury that the State had to prove each element of rape in the second degree beyond a reasonable doubt.

Gauthier contends that the State committed misconduct by intentionally appealing to the passion and prejudice of the jury. He makes a number of claims including the improper references to the "sexual assault unit" instead of the "special assault unit," mention of earlier "testimony," use of the word "attack," and isolated use of the word "rape" or "raped." SAG 8-9.[4] Some of his arguments involve facts, evidence, or rulings from his first trial which are not included in our record. Those claims are

---

[4] Some of Gauthier's arguments suggest the State violated motions in limine from Gauthier's first trial. Those are not included in our record for review.

properly raised through a personal restraint petition, not a statement of additional grounds. State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

In regards to Gauthier's other claims of prosecutorial misconduct, Gauthier must articulate how the alleged misconduct was substantially likely to affect the jury's verdict. In re Pers. Restraint of Glassman, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Beyond the conclusory assertion that the errors appealed to the "passion and prejudice" of the jury he has not done so. SAG at 11.

Gauthier argues that his attorney's failure to object to improper statements constitutes ineffective assistance of counsel. But Gauthier fails to provide sufficient detail in his SAG to allow for review.[5] Although reference to the record and citation to authorities are not necessary or required, the appellate court will not consider an appellant's SAG if it does not inform the court of the nature and occurrence of alleged errors. RAP 10.10(c); Alvarado, 164 Wn.2d at 569.

Gauthier claims his counsel was ineffective for failing to object to the admission of old booking photos. He is mistaken. Defense counsel did object.

Finally, Gauthier argues that the trial court abused its discretion when it denied defense counsel's motion for a mistrial or, in the alternative, excusal of juror 59 for cause. Counsel's motion was based on a deputy sheriff's report that one of the jurors spoke to him during a lunch break, telling him "I can't believe how much you remember." RP (Nov. 18, 2013) at 208. The trial court interviewed juror 59, who stated that she had

---

[5] Gauthier claims that he can "list over 50 places in 13 RP; 14 RP; 15 RP; 16 RP that shows failure to object on central testimony and the prejudicial statements before the Jury, and no reasonable persons mind could forget such prejudicial statements, even had objections been raised properly." SAG at 15.

not formed any opinions about the case and could remain fair and impartial. Because the trial court is best situated to determine a juror's ability to serve impartially, we review the court's denial of a for-cause juror challenge for abuse of discretion. State v. Rupe, 108 Wn.2d 734, 749, 743 P.2d 210 (1987). We cannot say on this record that the trial court abused its discretion in concluding that juror 59 could remain impartial.

## CONCLUSION

For the foregoing reasons, we affirm Gauthier's judgment and sentence.

WE CONCUR: