IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                    Respondent,<br><br>          v.<br><br>POLEVIA VALOAGA,<br><br>                    Appellant. | No. 85289-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — A jury convicted Polevia Valoaga of assault in the first degree with a deadly weapon enhancement, based on events over the course of approximately 20 minutes, during which Valoaga attacked the victim at a bus stop, followed him, and attacked him again in the middle of a highway. Valoaga asserts his right to a unanimous jury was violated when the trial court failed to provide a jury instruction on unanimity and the State did not elect which act constituted the crime charged. He also raises several issues in a statement of additional grounds (SAG) for review.

We affirm the conviction. However, we remand for resentencing as the State failed to prove Valoaga's criminal history and the court should not have imposed the victim penalty assessment (VPA).

FACTS

Federal Way, Washington, has a network of approximately 120 "live view" cameras located throughout the city. On September 20, 2021 around 7:37 p.m., one of

these cameras captured Daniel Whitesel being assaulted while waiting at a bus stop on Pacific Highway South and South 312th Street.

In the moments leading up to the attack, an individual in a black hoodie and red pants with an orange backpack walked toward Whitesel. Whitesel turned his back to the person and began to walk away, but within seconds, the individual jumped and kicked toward Whitesel and struck the back of his head. Whitesel immediately collapsed to the ground, and before he could get up, as he laid on the sidewalk, the person swiped at Whitesel with a long object.

Whitesel rolled away from the assailant, stood up, and crossed to the other side of Pacific Highway South, traversing three lanes of traffic to the median and then three lanes of traffic going in the other direction. Around ten seconds later, the assailant walked into the highway as well, also not at the intersection, crossing the six lanes of traffic. Once across, Whitesel walked south, as did the attacker. At about 7:44 p.m., Whitesel crossed the highway back to the west side, followed by the individual around a minute later.

Both individuals disappeared from the cameras' view for about six minutes, until they reappeared at 7:51 p.m. on the east side of the highway walking north. Whitesel walked ahead of the individual, crossed the highway back toward the bus stop, and continued to head north from there. The individual followed this same path slightly behind Whitesel. Eventually, Whitesel crossed the highway back to the east side and continued north.

Whitesel continued to walk north while the individual walked parallel to him on the west side of the highway. Around 7:56 p.m., the individual left the sidewalk, walked

into some shrubbery, and stood there for about a minute. Afterward, he returned to the sidewalk and crossed the highway to the east and walked north in Whitesel's direction. Around 7:59 p.m., the individual stopped and appeared to pick up an object on the ground to his right.

A minute later, Whitesel attempted to cross the highway to the west side again, with the individual heading in the same direction. At about 8:01 p.m., the person caught up with Whitesel in the southbound lanes of Pacific Highway South, slashed at Whitesel's head with the object he was holding, and threw Whitesel to the ground in the middle of the highway. While Whitesel was on the ground, the individual slashed at him four more times, once around his abdomen and three times around his face and neck. The person ran off shortly after the encounter, and multiple witnesses called 911 to report the assault. Approximately 20 minutes elapsed between the initial encounter at the bus stop and when the individual left Whitesel in the middle of the highway. Officer Ramon Franco with the Federal Way Police Department later testified that the distance between the bus stop and the attack in the highway was "about a block, block and a half."

While setting up a perimeter to search for the assailant, Franco was driving slowly "about two blocks" from where Whitesel was found on the highway when he encountered a person matching the assailant's description standing "like a statue" facing what appeared to be a retaining wall. Franco trained his spotlight on Valoaga, gave verbal commands, "tripped the sirens," and told him he was under arrest, but Valoaga did not react and ignored Franco, "still facing the wall." Valoaga then stepped toward a nearby bush, "still not looking at [Franco]," ignoring him. Franco testified to

hearing a "loud thud" while Valoaga stood near the shrubbery. Shortly after Valoaga was detained, when Franco and another officer searched the area, they found an orange and black Fiskars brand pruning saw.

Police brought two people who witnessed the highway encounter to a show-up procedure to determine if Valoaga was the attacker they had observed. The two witnesses identified Valoaga as Whitesel's assailant. Whitesel was later shown a photomontage with six people, including Valoaga, but he was unable to make an affirmative identification. However, DNA analysis strongly indicated the presence of Whitesel's DNA in the blood on the blade of the saw that was retrieved near where Valoaga was detained. No forensic evidence linked the weapon to Valoaga. However, Valoaga had blood on several areas of his clothing, and testing showed different DNA contributors for the blood from the different samples, with moderate to limited support for inclusion of Whitesel's DNA in the various blood samples.[1]

The State charged Valoaga with one count of assault in the first degree with a deadly weapon enhancement. Valoaga pleaded not guilty. His defense theory at trial was denial that he was the assailant. The jury convicted Valoaga as charged. He was sentenced at the high end of the standard range and received a sentence of 171 months plus a 24-month deadly weapon enhancement.

---

[1] Forensic scientist Gina Dembinski discussed a sliding scale qualifier to clarify what the linkages signified. With the knife, it was 7 nonillion times more likely that the DNA profile originated from Whitesel rather than an unknown person from the U.S. population. For the bloodstains on Valoaga's hoodie, there were different DNA contributors. Around the front pocket, the blood stain indicated it was "420 times more likely to observe the DNA profile that [Dembinski] obtained if it was [] Whitesel and an unknown person versus . . . two random unrelated people from the U.S. population." On the front of the hoodie by the logo, it was "7.3 times more likely to observe the DNA profile if it originated from [] Whitesel and an unknown person versus two unknown unrelated individuals from the U.S. population." On the back of the left sleeve, it was only "two times more likely." In a final blood sample from the back of the hoodie, there was no support for the DNA being Whitesel's.

Valoaga timely appeals. He also filed a SAG.

DISCUSSION

Valoaga appeals his conviction on the basis that his right to a unanimous jury verdict was violated under article I, section 21 of the Washington Constitution. Alternatively, if the conviction is not vacated, Valoaga argues a resentencing hearing is necessary as the State failed to prove his criminal history and a VPA was improperly imposed on him given legislative changes. He also filed a SAG raising several additional issues, including prosecutorial misconduct, a confrontation clause violation, and insufficiency of evidence.

I.     Unanimous Jury

Valoaga contends his right to a unanimous jury verdict on the act constituting the charged offense was violated. In particular, he argues that either the State should have elected which act it relied on as the basis of the charge—the bus stop or highway encounter—or the jury should have been instructed to agree on a specific act. The State counters that it is excused from electing or providing a jury instruction on unanimity as the two encounters constituted a single, ongoing course of conduct. We agree with the State.

Criminal defendants have a right to a unanimous jury verdict. WASH. CONST. art. I, § 21; State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). When the State presents evidence of multiple acts that could constitute the crime charged, the jury must unanimously agree on which act constituted the crime. State v. Kitchen, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). To ensure unanimity, the State must either elect the act it is relying on or the trial court must provide a unanimity instruction, often

5

referred to as a "Petrich instruction." See State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984), overruled on other grounds by Kitchen, 110 Wn.2d at 405-06; see 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTION: CRIMINAL 4.25 (5th ed. 2024). Otherwise, some of the jurors may rely on one act while others may rely on another. Kitchen, 110 Wn.2d at 411. However, neither election nor a unanimity instruction is necessary if the defendant engaged in multiple acts that form a single continuing course of criminal conduct. State v. Rodriguez, 187 Wn. App. 922, 936, 352 P.3d 200 (2015).

"Whether a unanimity instruction was required is reviewed de novo." State v. Aguilar, 27 Wn. App. 2d 905, 924, 534 P.3d 360 (2023) (citing State v. Boyd, 137 Wn. App. 910, 922, 155 P.3d 188 (2007)). A violation "may be raised for the first time on appeal under the manifest constitutional error standard." Aguilar, 27 Wn. App. 2d at 918; RAP 2.5(a). A constitutional error occurs in a multiple acts case in which no election was made and no Petrich instruction was given, "but reversal is not warranted if the error was harmless." Aguilar, 27 Wn. App. 2d at 924.

As an initial matter, Valoaga argues the State is judicially estopped from presenting this argument because it clearly described the encounters as two separate assaults to the jury. We disagree.

"Judicial estoppel precludes a party from 'asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position.' " Serpanok Constr., Inc. v. Point Ruston, LLC, 19 Wn. App. 2d 237, 256, 495 P.3d 271 (2021) (quoting Miller v. Campbell, 164 Wn.2d 529, 539, 192 P.3d 352 (2008)). We consider three factors to determine whether judicial estoppel applies: (1) whether the

party's later position is clearly inconsistent with its earlier position, (2) whether accepting the new position would create the perception that a court was misled, and (3) whether a party would gain an unfair advantage from the change. Miller, 164 Wn.2d at 539.[2]

> During closing argument, the State began,
>
> This is a simple tree saw. . . . [I]n the hands of this defendant, Polevia Valoaga, this simple tree saw was used as a deadly weapon. We saw in the surveillance footage, we heard in the testimony of eyewitnesses that this defendant started his assault at [the] bus stop. What happened for the next 20 minutes was that the defendant used this deadly weapon to hack, to slash, to assault Daniel Whitesel. We saw in the surveillance footage as Daniel -- after that initial assault, Daniel tried to get away. He did his best. . . . He walks slowly, constantly looking behind him. And the defendant slowly pursued. . . . You heard testimony that he pursued him all of the way up and until in front of Bucky's where he initiated his second assault.[3]

Thus, the State's position during trial, as stated in closing, was that the assault was a continuous course of conduct beginning with the assault at the bus stop, with the defendant "slowly pursu[ing]" Whitesel "all of the way up and until" the final attack in the road. Thus, under factor one, the position the State took at the trial level is not "clearly

---

[2] These factors are not exhaustive, and " '[a]dditional considerations' may guide a court's decision." Arkison v. Ethan Allen, Inc., 160 Wn. 2d 535, 539, 160 P.3d 13 (2007) (quoting New Hampshire v. Maine, 532 U.S. 742, 751, 121 S. Ct.1808, 149 L. Ed. 2d 968 (2001)). However, Valoaga does not provide analysis of the issue beyond these three factors.

[3] In discussing the jury instruction regarding jurors' obligations, the State did not reference any particular number of assaults or the acts it alleged to constitute the crime:

> Instruction No. 2 . . . reads that, as jurors, you have agreed to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict. . . . What doesn't happen -- what it doesn't have to be is that you don't all have to agree as to the reasons for your belief beyond a reasonable doubt that this defendant is guilty. You have to be unanimous in the belief that he is, in fact, guilty, but you can have different reasons for that belief. You can arrive at that conclusion through different paths, okay. I just want to make that clear, that everyone can have kind of differing opinions as long as you are unanimous in your belief that this defendant is guilty.

inconsistent" with its current position that the attack constituted a single, ongoing assault.[4]

As for factor two, which focuses on whether accepting the new position would create the perception that a court was misled, the trial court did not accept any position because the issue of jury unanimity was not raised below,[5] and there were no relevant rulings on the matter. Similarly, as for factor three, whether the State would gain an unfair advantage from the change, as there was no change in position, this factor, too, weighs against applying judicial estoppel.

We next address the merits of Valoaga's unanimity claim. The State contends Valoaga engaged in a continuous course of conduct. Neither election nor an instruction on jury unanimity is required if a defendant's acts can be characterized as a " 'continuing course of conduct.' " State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995) (quoting State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989)). A continuing course of conduct is "an ongoing enterprise with a single objective." State v. Love, 80 Wn. App. 357, 361, 908 P.2d 395 (1996).

Because assault is a course-of-conduct crime, multiple assaults committed within a short period of time may be considered one continuous act. E.g., State v. Monaghan, 166 Wn. App. 521, 537, 270 P.3d 616 (2012). "We evaluate whether the evidence shows conduct occurring at one place or at many places, within a brief or long period of

---

[4] Valoaga highlights a variety of times when the State refers to the assault as "an initial" and "subsequent" assault. He also points to a Google Earth image of the area which was submitted as an exhibit and labeled the two locations of the encounters as the "first assault" and "second assault." However, there were also multiple times when the State referenced the incident as a single assault. Using terminology to describe the sequence of events does not necessarily mean the events were not part of a continuous course of conduct. Thus, the position taken by the State at trial is not "clearly inconsistent" with its current position, particularly in the context of its closing argument.

[5] Indeed, as the issue of jury unanimity is one of constitutional magnitude, it may be raised for the first time on appeal. Aguilar, 27 Wn. App. 2d at 918.

time, and to one or multiple different victims . . . ." State v. Lee, 12 Wn. App. 2d 378, 393, 460 P.3d 701 (2020). A "brief period of time" can include acts within a span of a few hours, or even weeks. See State v. Crane, 116 Wn.2d 315, 330, 804 P.2d 10 (1991) (holding that continuous course of conduct exception to unanimous jury verdict applied because fatal assault of three-year-old could have occurred only during a two-hour span); State v. Craven, 69 Wn. App. 581, 588, 849 P.2d 681 (1993) (defendant charged with single count of assault for injuries suffered by 16-month-old during a three-week period; evidence supported State's theory of "systematic pattern of abusive conduct which lends itself to the continuing course exception"). "Common sense is the guiding light of this analysis." Aguilar, 27 Wn. App. 2d at 925.

For example, in Handran, the defendant climbed in through the window of his ex-wife's apartment, and she awoke to find him leaning over her, nude and kissing her. 113 Wn.2d at 12. She demanded that he leave immediately, but instead, he pinned her down, offered her money, and hit her in the face. Id. Handran argued that the jury could have found an assault either in his kissing his ex-wife or in his hitting her, but the court held that these two acts of assault were part of a continuing course of conduct. Id. at 17. The court noted that the acts occurred in one place, during a short period of time, with the same aggressor and victim, and reasoned, "Under a commonsense evaluation of these facts, the actions evidence a continuing course of conduct to secure sexual relations with his ex-wife, whether she consented or not, rather than several distinct acts." Id.

By contrast, in Aguilar, the court reasoned that although there was only one victim and the relevant acts all occurred in one location, the evidence only

superficially indicated a continuing course of conduct. 27 Wn. App. 2d at 927. Instead, the court held that the defendant's numerous activities between the multiple acts of rape—such as "searching for and doing drugs, pretending to sip wine," breaking belongings, and destroying furniture—did not demonstrate the existence of an ongoing enterprise with a single objective because he "acted erratically under the influence of intoxicants, his focus shifting rapidly from one thing to another." Id.

Here, the evidence and common sense support concluding that Valoaga engaged in a continuous course of conduct. The bus stop and highway encounters took place near one another, within a block to a block and a half of one another and within a relatively brief period of time, 20 minutes. The attacks also involved the same perpetrator and the same victim.

There is also no evidence to suggest Valoaga's objective changed between the assaultive acts. Although the video shows Valoaga standing in the shrubbery at one point and stopping another time briefly to pick something up, the majority of the video showed Valoaga, in the prosecutor's words, "slowly pursu[ing]" Whitesel. Nor was there an intervening act or event, as the evidence from multiple sources showed Valoaga following Whitesel for a stretch of nearly 20 minutes. While there is an approximately six-minute break in the surveillance footage during which Whitesel and Valoaga are not on camera, during some of this time, witness Jennie Robert testified she saw the two and watched them walk southbound on Pacific Highway before temporarily losing sight of them. Otherwise, Whitesel and Valoaga appeared engaged in a similar pattern of

movement despite being off-camera, as verified by the additional video footage and Robert's second call to 911 in which she confirmed Valoaga continued to follow Whitesel.

Here, while there were two distinct attacks on Whitesel, the evidence showed Valoaga following Whitesel for 20 minutes, beginning with the first attack at the bus stop until the second attack in the middle of the highway. We conclude these acts constituted a continuing course of conduct, not multiple distinct acts. Therefore, no Petrich unanimity instruction or election was required.

II.     Claims Regarding Sentencing

Valoaga challenges his judgment and sentence, claiming the State failed to prove his criminal history at sentencing, so a new sentencing hearing is required. The State agrees.

The prosecution bears the burden of proving a defendant's criminal history at sentencing by a preponderance of the evidence. State v. Cate, 194 Wn.2d 909, 912-13, 453 P.3d 990 (2019). "The best evidence of a prior conviction is a certified copy of the judgment," but "the State may introduce other comparable documents of record or transcripts of prior proceedings to establish criminal history." State v. Hunley, 175 Wn.2d 901, 910, 287 P.3d 584 (2012) (quoting State v. Ford, 137 Wn.2d 472, 480, 973 P.2d 452 (1999)). Only an affirmative acknowledgement of criminal history waives a challenge on appeal. State v. Ross, 152 Wn.2d 220, 233, 95 P.3d 1225 (2004).

The only evidence of Valoaga's prior convictions was Appendix B to his judgment and sentence, which listed four felony convictions in King County. Valoaga never agreed to the accuracy of the documents, and the State "concedes that the Appendix B

did not, on this record, establish Valoaga's criminal history by a preponderance of the evidence." Cate, 194 Wn.2d at 913. Thus, the remedy is a new sentencing hearing. Id. at 914.

Valoaga also asserts that this court should strike the VPA because he is indigent and recent amendments to the statute bar courts from imposing such fees on indigent defendants. In 2023, the legislature amended RCW 7.68.035 to prohibit courts from imposing the VPA when the defendant is indigent pursuant to RCW 10.01.160(3). RCW 7.68.035(4). Amendments to statutes governing legal financial obligations apply retroactively to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). The State agrees that the VPA should be stricken. Thus, upon remand, the new sentence should not include the VPA.

III.     Statement of Additional Grounds for Review

Valoaga raises three separate issues in his SAG. First, he argues his Sixth and Fourteenth Amendment rights were violated when the prosecutor commented on the forensic evidence associated with the clothes and the saw that were submitted at trial.[6] Second, he argues his Sixth Amendment right to confrontation was violated as the "forensic scientist was not present to verify and confirm lab[or]atory" evidence. Finally, he argues there was insufficient evidence to support the special verdict that he was armed with a deadly weapon at the time of the commission of the crime. The State did

---

[6] Generally, Valoaga also argues his rights were violated by the admission at trial of the clothes he was wearing and the saw located near him at the time of his arrest. But beyond this preliminary statement, he provides no additional argument on the matter or citation to the record informing this court "of the nature and occurrence of the alleged errors." State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). "Although reference to the record and citation to authorities are not necessary or required, the appellate court will not consider an appellant's SAG if it does not inform the court of the nature and occurrence of alleged errors." State v. Gauthier, 189 Wn. App. 30, 43-44, 354 P.3d 900 (2015). Accordingly, we do not consider Valoaga's claim regarding the admission of his clothes and the saw as evidence.

not respond to these additional issues raised on appeal. Valoaga's additional claims are unavailing.

A.    Prosecutorial Statements

Valoaga argues that "[i]naccurate non-verified statements were . . . stated by [the] prosecutor during trial," and those statements "prejudiced defendant's trial," as the prosecutor referenced forensic evidence and is not an expert witness. In particular, he highlights the prosecutor's statements during closing argument that three of the blood stains on the hoodie "indicated the blood belonged to the victim." Although Valoaga cites to Frye v. United States[7] and State v. Cauthron[8] to support this claim, at trial, he did not challenge the testimony of the forensic scientist for the Washington State Patrol Crime Lab who performed the DNA analysis for the knife and clothing, Gina Dembinski. Rather, the focus of Valoaga's challenge in his SAG appears to be the prosecutor's statements made in closing argument about this evidence.

"Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard." State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014) (quoting State v. Brett, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995)). The defendant bears the burden of showing the comments were improper and prejudicial. Lindsay, 180 Wn.2d at 430 (citing State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008)). Although prosecutors cannot reference evidence outside the record in their closing arguments, prosecutors generally have wide latitude, and the comments are reviewed in

---

[7] 54 App. D.C. 46, 293 F. 1013, 34 A. L. R. 145 (1923). Under the Frye standard, "evidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community." State v. Martin, 101 Wn.2d 713, 719, 684 P.2d 651 (1984).

[8] 120 Wn.2d 879, 906, 846 P.2d 502 (1993) (holding testimony that defendant's DNA "matched" perpetrator's was erroneously admitted, in that it was unsupported by valid probability statistics), overruled in part on other grounds by State v. Buckner, 133 Wn.2d 63, 941 P.2d 667 (1997).

the context of the total argument. State v. Fisher, 165 Wn.2d 727, 746-47, 202 P.3d 937 (2009). When there is no objection to the argument, "the issue of misconduct is waived unless the conduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Lindsay, 180 Wn.2d at 430.

Here, we conclude it was not reversible misconduct for the prosecutor to discuss the bloodstains on the hoodie, as at trial, Dembinski was introduced as a forensic scientist and testified to the results referred to by the prosecutor. In the context of the prosecutor's comment, the preceding argument continually referenced Dembinski's testimony and accurately recounted the diminishing statistical likelihood of a match to Whitesel. The prosecutor's argument was based on the evidence and Valoaga cannot show the comments were improper, much less that they were so flagrant and ill intentioned that an instruction could not have cured any resulting prejudice.

B.     Confrontation Clause

Valoaga contends the "forensic scientist was not present at trial and pre-trial" and this absence violated his Sixth Amendment right to confront witnesses against him. We disagree.

Both the federal and state constitutions protect the rights of criminal defendants to confront adverse witnesses. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; Crawford v. Washington, 541 U.S. 36, 42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). " 'The primary and most important component' of the confrontation right 'is the right to conduct a meaningful cross-examination of adverse witnesses.' " State v. Orn, 197 Wn.2d 343, 347, 482 P.3d 913 (2021) (quoting State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002)). When considering the DNA testing process, defendants have a

right " 'to be confronted with the analyst who made the certification.' " State v. Lui, 179 Wn.2d 457, 490, 315 P.3d 493 (2014) (quoting Bullcoming v. New Mexico, 564 U.S. 647, 652, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011)). This court reviews confrontation clause issues de novo. State v. Jasper, 174 Wn.2d 96, 108, 271 P.3d 876 (2012).

The forensic scientist who performed all of the testing on the items related to the case, Dembinski, testified at trial, eliminating the concern that an unrelated analyst reported the results. She was available for cross-examination, and Valoaga availed himself of the opportunity, eliciting testimony in which she acknowledged items can become contaminated with DNA at the lab or during the collection process. Dembinksi also testified on cross-examination that the DNA she tested was not necessarily from the blood found on the clothing given the processes involved. Valoaga was not unconstitutionally deprived of his right to confront Dembinski.[9]

C.      Sufficiency of Evidence

Finally, Valoaga contends there was "[i]nsufficient evidence to prove assault with [a] deadly weapon beyond [a] reasonable doubt," as "[t]here is no correlating evidence tying the deadly weapon to the defendant" and "[t]he weapon was not found on [Valoaga's] person" when arrested.[10] We disagree.

Due process requires that the State prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). To determine whether sufficient evidence supports a conviction, an appellate court must

---

[9] Valoaga also argues there was a pre-trial confrontation clause issue, but as it was discussed above, Dembinski was not present at any pre-trial hearings because there were no challenges to the admissibility of her testimony.

[10] In support of this assertion, Valoaga additionally cites to "State v. Altam 2022," which we interpret as a reference to State v. Altman, 23 Wn. App. 2d 705, 520 P.3d 61 (2022).

"view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." State v. Homan, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Id. Circumstantial and direct evidence are equally reliable. State v. Lazcano, 188 Wn. App. 338, 363, 354 P.3d 233 (2015). Whether sufficient evidence supports a defendant's conviction is a question of law reviewed de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

Under RCW 9A.36.011(1)(a), "[a] person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm . . . [a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death . . . ." A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime. RCW 9A.08.010(1)(a). Great bodily harm means bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ. RCW 9A.04.110(4)(c). Finally, a deadly weapon includes any weapon, device, instrument, article, or substance . . . which, under the circumstances in which it is used . . . is readily capable of causing death or substantial bodily harm. RCW 9A.04.110(6).

After viewing the video footage, any rational fact finder could find beyond a reasonable doubt that the assailant in the video intended to inflict great bodily harm, as slashing at the face and neck of an individual with a pruning saw is likely to result in serious injury like death or disfigurement. Indeed, Whitesel and his attending physician testified that he received multiple lacerations to his face and upper neck that required stitches. Additionally, the pruning saw qualifies as a deadly weapon under the circumstances, due its utilization in the aforementioned way.

When viewed in a light most favorable to the State and assumed true, the evidence is also sufficient to establish that Valoaga was the individual who used the saw to assault Whitesel, despite it not being found directly on him when he was arrested. Video footage shows the assailant attacking Whitesel with an object with a shiny blade and orange handle consistent with the pruning saw that was later found. Franco testified that he heard a "loud thud" when initially confronting Valoaga a few minutes after the highway encounter. Shortly after Valoaga's arrest, Franco searched the nearby bushes with other officers and found a folded saw, which would later be identified as an orange and black Fiskars pruning saw. Further forensic testing confirmed the saw contained Whitesel's DNA. Valoaga's clothes also contained blood stains, which upon testing provided some support for inclusion of Whitesel's DNA, although the probability was lower than that of the blood on the saw. Overall, there is sufficient evidence for any rational fact finder to connect Valoaga to the saw.

Further, there were two people who had witnessed the highway encounter and identified Valoaga through field show-ups shortly after he was arrested. Each of them confirmed that Valoaga was the same person they witnessed assault Whitesel earlier.

The arresting officer, Franco, also confirmed Valoaga was wearing clothing that matched the attacker from the video. Additionally, various cameras recorded a bulk of the ongoing incident and showed the same assailant following Whitesel. The surveillance footage also captured two times where the individual pulled the saw in and out of their front sweatshirt pocket. Because all reasonable inferences must be interpreted in favor of the State, this portion of the evidence also connects Valoaga—and the saw—to the assault.

Therefore, we conclude a rational fact finder could determine beyond a reasonable doubt that Valoaga was armed with a deadly weapon when he assaulted Whitesel.

CONCLUSION

We affirm Valoaga's conviction but remand for resentencing because the State failed to prove his criminal history and the VPA was improperly imposed.

_____
Chung, J.

WE CONCUR:

_____          _____
Coburn, J.                                Hazelrigg, ACJ

18